Leary *v.* Philadelphia et al., Appellants.

Argued December 8, 1933.   Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*T. B. K. Ringe,* with him *Ernest Lowengrund,* Assistant City Solicitors, and *David J. Smyth,* City Solicitor of Philadelphia, for appellants.

*James F. Masterson,* with him *James P. McGranery* and *Martin Feldman,* for appellee.

*T. Henry Walnut, Isaac C. Sutton* and *Albert Smith Faught,* submitted a brief for Pennsylvania Civil Service Association as amicus curiæ.

OPINION BY MR. JUSTICE SIMPSON, April 23, 1934:

Plaintiff, who was at one time a patrolman of the City of Philadelphia, filed herein a petition for a writ of peremptory mandamus against the city itself (as to which, however, no relief is specifically asked); and against Kern Dodge, who at that time was director of the department of public safety, requiring [him] to show cause "why he should not forthwith designate your petitioner as a patrolman in the bureau of police, department of public safety of the City of Philadelphia, and assign your petitioner to the proper duties incident to the said office"; and against J. Hampton Moore, who then was mayor of the city "to show cause why [he] should not see that the petitioner is designated as a patrolman in the bureau of police and assigned to the duties incident to said office." The mayor and director who were filling those offices during all the proceedings of which plaintiff complains, are not parties to the suit. A return was made to the alternative writ, and, by agree-

ment, a jury trial was waived and the trial had by and before one of the judges of the court below. This resulted finally, after exceptions had been filed and disposed of, in the award of the peremptory writ as prayed for; whereupon defendants appealed. The judgment must be reversed; and we would so conclude whether we agreed or disagreed with the court below in its findings of fact and its inferences therefrom.

On the main question in the case the facts are few and undisputed, and the law is clear beyond cavil. Prior to 1932 the number of patrolmen in the city, fixed by ordinance, was 4,530. By article XVII, section 2, of the Charter Act of June 25, 1919, P. L. 581, 606, it is provided that the city council, in adopting its "financial program for the ensuing year......shall be bound to accept the estimates of receipts and liabilities [furnished by] the controller, but shall have full discretion to determine the character and amount of expenditures to be made out of the estimated receipts of the city during the ensuing year."

In December of 1931, when the finance committee of the city council, and later the council itself, had under consideration the budget for 1932, it was evident to every one that drastic economies would have to be made. Plaintiff himself admits this, saying in his brief: "It is conceded that the budget for the City of Philadelphia for the year 1932, on account of the condition of the city's finances, had to be reduced and economies had to be effected to make the budget fit the prevailing tax rate." One part of the community contended that the police force should not be decreased in number, nor the wages of its individual members lessened; and others that the force should be decreased in number, or the wages of the individual members lessened, or both. The director of public safety who was then serving (hereinafter called the director, but is not the defendant named as such in this record) belonged to the first class. Indeed, he at first urged an increase in the force, and, in

default of that, strenuously opposed the reduction in either respect. Subsequently learning that the finance committee of council, which then had the matter in charge, had determined that, for the reason stated, a reduction in one or the other respect would have to be made, he stated to the committee that he believed it would be better for the city to continue the existing wages and salaries, and to reduce the number of patrolmen from 4,530 men to 4,400 men. This was the course finally adopted by the committee, and by the council itself by an ordinance passed during the evening of December 31, 1931, and later on that night signed by the mayor. When the budget for 1932 was thus adopted and approved providing for but 4,400 men, it became necessary to reduce the force by 130 men in order to comply therewith. This was done, and the 130, one of whom was plaintiff herein, received written notice from the director, that because of this action of the council they need not report for duty after midnight of December 31, 1931. Notice of this separation of the 130 men was given to, but not expressly approved by, the civil service commission. Because of this latter fact, plaintiff contended, and the court below decided that all the 130 were improperly separated from the force. This contention would have been sound if they had been severally dismissed for improper actions on their part, and the number of authorized patrolmen continued as theretofore, but where, as here, the separation of the 130 men was necessitated by the council's reduction of the force, caused by enforced economy, and the total membership of the force was then actually reduced, no action by the commission was required. We said in Essinger v. New Castle, 275 Pa. 408, 411: "Civil service acts are designed to secure the appointment of competent public servants, and protect them in their employment from attacks on personal grounds, so long as they are well behaved. They are not intended to retain in office at public expense those whose services may be dispensed with

for economy...... These statutes are not intended to affect or control the power of the city council, or the executive officers of the city, to abolish offices when they are no longer necessary, or for reasons of economy. They are not intended to furnish an assurance to the officer or employee that he will be retained in the service of the city after the time when his services are required. ...... In the absence of some constitutional provision or legislative enactment, notwithstanding the Civil Service Act, the municipality may do away with an office created by it, though the effect is the removal of an employee from his situation: 5 R. C. L. 614. Though not the subject of previous discussion in Pennsylvania, this has been the uniform ruling in many states where consideration has been given to the question: Harker v. City of Bayonne, 85 N. J. L. 176; Washington v. Seattle, 74 Wash. 199, 133 Pac. 11; Shawanee v. Hewett, 37 Okla. 125, 130 Pac. 546; People v. Lindenthal, 173 N. Y. 524, 66 N. E. 407; Gardner v. Lowell, 221 Mass. 150, 108 N. E. 937; note 4, A. L. R. 205."

Many other cases are to the same effect, as see Oldham v. Birmingham, 102 Ala. 357; O'Neill v. Williams, 199 Atl. 870; Heath v. Salt Lake City, 16 Utah 374; Venable v. Portland Police Commission, 40 Ore. 458; People v. Ham, 166 N. Y. 477; Moores v. State, 54 Neb. 486; Lathbridge v. Mayor, 133 N. Y. 232; and, so far as we have been advised, no court of last resort in this country now reaches an opposite conclusion, if, indeed, any one ever did.

In a vain attempt to escape the effect of the Essinger Case, appellee points to three supposed distinctions between it and the present, each of which, so far as it is such, is a "distinction without a difference," and hence is of no moment. In the first place, he quotes from that case (275 Pa. 410) the following: "Admittedly, in the present case, the course pursued was not taken to secure the removal of Essinger on political grounds, or as a mere subterfuge, adopted to reach some end by appar-

ently legal methods, but was a bona fide attempt to cut down the expenses of the city by ceasing to engage one whose services were believed not requisite for the proper conduct of its affairs." This is likewise true in the present case. The reduction here was by city council and the mayor, against whose good faith there is neither averment nor proof. If appellee had not been included in the 130, some one else would have had to be, and everything said herein about the director, would have applied to such other person as fully as it does to appellee, for, as respects the director's personal relation to and removal of appellee, not one antagonistic word is to be found in the evidence.

So, also, appellee quotes the following from 2 Dillon on Municipal Corporations (pages 805, 806, 807, note) : "But although the operation of these [civil service] statutes does not prevent the abolition of an office in good faith, the local authorities have no power to discharge an officer or employee of the city upon the pretense that his office is abolished and immediately thereafter assign another person to do the same work which had been done by the discharged employee." Nor has that been done here. The places of none of the 130 removed men, has ever been filled by others; the force still remains at 4,400 men. Nor,—and this is particularly important on a point later to be considered,—have "the local authorities," that is the mayor and council, been shown to have had any "pretense" in what they did; all was open and above board, and solely for the public good, on the grounds of economy. Moreover, plaintiff's citation from Dillon stops just too soon. The immediately succeeding sentence is: "When the statute declares that the incumbent of an abolished office shall be deemed suspended without pay, and shall be entitled to reinstatement in the same or any corresponding office if within one year there is need for his services [as was also the situation in the instant case] the power to determine the necessity for his services is vested in the head of the department

or appointing power, and cannot be controlled or reviewed by the courts."

Finally we are told that the mayor and council did not formally abolish appellee's office. True, neither appellee nor any one else was named in the ordinance, but it required the separation of 130 of the existing 4,530 patrolmen, each of whom, including appellee, held an office, and when the removals were made, appellee and the other 129 men were all effectually separated from their offices. There was no legal requirement that the 130 should be proceeded against eo nomine, either in bulk or separately. When the ordinance requiring the reduction was duly passed and approved, without naming the official who should select those who were to be removed, it simply placed upon the proper official,—in this case the director,—to make them under the new ordinance. He who would go further on this point, may wisely read Judge CARDOZO's opinion in People ex rel. Davison v. Williams, 213 N. Y. 130.

It is clear beyond all doubt, therefore, that the ruling of the court below regarding the need for action by the civil service commission was erroneous. Seemingly recognizing that this was a necessary conclusion, though still protesting otherwise, plaintiff next contends that the director was not the person legally authorized to select the men to be separated because of the budget ordinance necessitating it. This contention is, however, even more futile than the first, since plaintiff does not, and cannot, upon any authority, name some one else who was authorized to select the 130 men to be separated.

In 2 McQuillen on Municipal Corporations, section 574, page 315, it is said: "In the absence of legislation on the subject of removals and grounds therefor, it is usually held that the power to remove is incident to the power to appoint." And again, section 581, page 345: "The prevailing rule is that, where the power of appointment is conferred in general terms, and without restriction, the power of removal, in the discretion and at the

will of the appointing power, is implied, and always exists unless restricted and limited by some provision of law, and civil service laws do not operate as a restriction upon such power of removal, unless [expressly] so provided." To the same effect are Callahan v. Phila., 312 Pa. 40; McCoach v. Phila., 273 Pa. 317, and Com. v. Phila., 273 Pa. 332.

By article V, section 2, of the Charter Act of 1919, it is provided (page 591) : "The director shall appoint such other officers and employees as may be provided for by ordinance." And by article V, section 3, of the same statute (P. L. 591) it is declared that "The department of public safety shall have the care, management, administration and supervision of the police affairs, and all matters relating to the fire and police forces." "Under the rule that the power which appoints may remove," supra, there being no statute or ordinance to the contrary, the director was, of course, the official who had the duty of designating which 130 of the 4,530 patrolmen then on the force, should be separated therefrom, and be placed upon the preferred list kept by the civil service commission.

Plaintiff finally contends that even if the director had a discretion in determining which of the 4,530 men should be separated from the force, he abused his discretion in the present instance and hence his action must be wholly ignored. As we will later show, this is not a cognizable matter in the instant case, but, if it were, the instances would be few indeed in which the courts should so hold, in a case where, as here, the alleged abuse of discretion was by one (the then director) who is not a party to the proceeding, and the punishment is sought to be inflicted upon one (the city) who admittedly was entirely innocent. In the present case, however, the evidence and the proper inferences therefrom do not justify the finding of an abuse of discretion. Assuming as true all the facts favorable to plaintiff, which were proved, and the proper inferences therefrom (where improper,

we reject them and draw our own inferences: Jordan's Est., 310 Pa. 401, and cases cited therein) the alleged abuse of discretion, must be found, if at all, in the following résumé of the evidence:

While, as stated, there were, by ordinance, 4,530 patrolmen authorized to be employed during 1931, the director could not fill up the quota, though constantly expressing a desire to do so, because the civil service commission, whose duty it was to supply him with a list of eligibles from which the appointments had to be made, though frequently requested, had not in fact done so. This status continued until December 14th of that year, when, for the first time, such a list was furnished by the commission, and from it the director began to fill the vacancies on the force, then 179 in number, the last eight being appointed on December 31, 1931. This occurred during the time the city council was considering the budget for 1932 and determining therein, as required by statute, the number of policemen which was to compose the force during 1932, and the salary and wages to be paid the members thereof: Richardson v. Phila., 312 Pa. 173. As we have already said, there was much contention as to what should be done, and, when finally this was determined, the director had, of course, to act at high speed, in order to make, in proper time, the selection of the 130 men who were to be separated from the force, and go upon the preferred list of the civil service commission. He says he did this after a careful study of the police department records of about one-half of the 4,530 men, and a report made to him that, under no circumstances should any of the 130 be taken from the other half. He says he first selected the names of 400 or 500 men who could best be spared, then sifted them over until the list was reduced to 200, then again down to 150, and then again until there was left only the 130 men, whom, as he testified, he "thought the department could best afford to lose," and who were, for that reason, named as those to be separated. There is neither averment nor

proof that any of the 130 laid off, were selected for political or partisan reasons, or because of any religious prejudice or difference in religious views,—which the civil service acts show are the matters particularly legislated against.

Attached as an exhibit in this case is the office records of the 130 men, nearly all of whom were shown to have been repeatedly punished for breaching their duty to the public, some more and some less often than others, plaintiff having been eight times fined, twice discharged and once reprimanded. So far as we are advised, none of those were inflicted by or at the instance of the director, nor does it appear that the director, or any friend of his, ever knew, or knew of, any of the 130 men who were dropped from the payroll for 1932. That the director may have made a few mistakes,—a fact upon which plaintiff so persistently harps,—only proves that he was a human being, acting at high speed, in picking out, in the four remaining days of his term of office, the 130 men who could best be spared. This highly important police record confirmation of the director's testimony, is not even referred to in the opinion of the court below, nor did it refer to the fact that the succeeding director, against whom no complaint is made, after a careful and ample later study, unqualifiedly approved of the removal of plaintiff and all the others. Yet because the 130 men were all taken from the older members of the force, and not from the 179 new appointments made during the last half of December, 1931, the court below mistakenly draws the inference that the then director had some improper motive in making the selections he did. He was not legally obliged to delay in making the 179 appointments; on the contrary, so far as there was a legal obligation, it was precisely the reverse. No one says that he was asked to delay the appointments, and then, because of the new ordinance, refuse to make 130 of them, thereby keeping down the force for the ensuing year to the 4,400 limit required, though there is much

hinting that it would have been wiser if he had done so. Quite possibly it would, though that lack of wisdom, if such it was, furnishes no basis whatever for the uncalled for insinuations against the director, nor for the alleged abuse of his discretion. He was under no legal duty to later eliminate any of the new men instead of the older ones, nor is there any statute or opinion even hinting that he was, though, of course, he could have taken any or all of the 130 therefrom. In the light of these facts we think the correct inference,—especially as innocence is always to be presumed,—is that, so far as appears, the director did not abuse his discretion in acting as he did. Yet, when the case is fully investigated, this imaginary fact is the only suggested basis for the mistaken judgment of the court below.

It is true it also says "The evidence on behalf of the plaintiff shows that, in a number of instances, he [the then director] selected men for discharge against whom he had taken a personal dislike, or who had suits against the city for wages that were due them for the period of illegal suspension." This statement begs the question and wholly ignores the facts. Whether or not the suspension was "illegal" was the question being considered; yet the court below assumes it to be true in order to prove that it was true. Moreover those who had suits against the city expressly agreed, before this proceeding was begun, as plaintiff himself proved, that they would waive all right to back wages if they were restored to office. There were but two witnesses called to substantiate the alleged charge of personal dislike in "a number of instances." Neither of them testified to anything respecting the relations between plaintiff and the then director, and this is the only matter with which we are here concerned. One of the two said that in December, 1931, the then director told him that "unless he [the witness] withdrew a suit he had against the City of Philadelphia, that he would be......fired by the director......'if it was the last thing he did when in office.'"

The absurdity as to withdrawing the suit has already been pointed out. The police record of this man shows that he was "held for court for extortion but not found unfit. Charges pending." The other witness said that in January, 1931,—an unimportant date in this proceeding,—"the [then] director told me that as long as he was director of public safety he would never put me to work. He further stated that I would go to work when he lost his right arm."

It is clear, therefore, that there is nothing in this record which justifies the conclusion below, that the then director abused his discretion in including plaintiff among the 130 men to be separated from the force, because of the reduction in its membership for economical reasons. It may not be inappropriate to quote, however, from Washington ex rel. Voris v. Seattle, 74 Wash. 199, as follows: "Much of the brief of the respondent is taken up with a discussion that goes to the good faith of the city council in abolishing this office. Courts will not inquire into the motive of the legislative body...... If the rule were otherwise it would be impossible for the governing body of a city to change, rearrange or redefine the duties of its employees, so long as any of them had been classified by the civil service commission and had a scintilla of work to perform...... The council having the right to abolish the position occupied by the relator, it would be an unwarranted usurpation for the court to go behind the question of the good faith of that body...... *Nor does the testimony offered to show that the controller has acted in bad faith have any bearing. Whatever his design may have been, it is lost in the ordinance.*"

Moreover, the question of an abuse of discretion has no place in the consideration of a case like the present. The director had not merely the right to separate 130 men from the police force, it was also his absolute duty. "Unless the means employed are unlawful, the motive for the acts are immaterial. No malice of any sort or

character can be imputed to one who exercises an absolute right, whatever his motives...... If one has a legal right to do a particular thing the law will not inquire into his motive for doing it: Beirne v. Continental Equitable Title & Trust Co., 307 Pa. 570"; Kirmse v. Adler, 311 Pa. 78, 86; Vetter's Est., 308 Pa. 447; Titusville Amusement Co. v. Titusville Iron Works, 286 Pa. 561. So also we said in Brower v. Kantner, 190 Pa. 182, quoting with approval from Field v. Com., 32 Pa. 478, "Where an appointment is during pleasure, or the power of removal is entirely discretionary, there the will of the appointing or removing power is without control, and no reason can be asked for, nor is it necessary that any cause should be assigned." On this principle we decided in Scott v. Pgh., 266 Pa. 52, that the law will not enjoin the opening of a cul-de-sac short street, at the instance of a property owner whose land was being taken in so doing, because, as he alleged, the opening ordinance was passed for the sole purpose of benefiting another property owner, who was a friend of the councilmen, and whose property would, by the opening, abut on the dead-end of the new street, thereby giving its occupants an outlet thereover.

Another consideration reaches to the same absolute conclusion that this proceeding cannot be maintained. The city is the only real defendant; she, and her citizens through her, are the only ones who will suffer, to the extent of nearly $500,000, if the judgment below is affirmed. She is an arm of the State, and the mayor and city council, who are conducting its affairs, are the delegated officials of the Commonwealth performing, as the latter's agents, her duties within the territorial limits of the city, so far as concerns all matters relating to the running of the municipal government. This record is barren of anything attacking the good faith and sound discretion of any of those officials. One of their duties is to yearly budget the city's expenses, and in doing this they were required to, and, in December, 1931, in fact

did, by the appropriation ordinance of that year, determine what number of police officials,—officers and patrolmen,—there should be for 1932, and what salary and wages each of them should be paid. Without such appropriation ordinance no recovery could be had against the city by any one. Article XVII, section 10, of the Charter Act of June 25, 1919, P. L. 581, 609, provides as follows: "No liability shall be enforceable against the city, by any action at law in equity or otherwise, upon any contract......and no payment may be enforced by any such action for services rendered to the city or to any such department......unless there shall have been a previous appropriation by the council to pay for such services." And again in article XVII, section 4, P. L. 607: "No contract shall be binding upon the city...... and no warrant shall be drawn, issued or approved by any officer of said city for any expenditure by any such department, officer, board, commission, trust, committee, or other agency, unless an appropriation has previously been made in accordance with the provisions of this act; and no warrant shall be drawn against any item in said appropriation in excess of said item; and any contract made or warrant issued in violation of this article shall be absolutely void."

In construing similar language in section 5 of the Act of April 21, 1858, P. L. 386, the late Judge THAYER, in his usual forceful way, said in Gamble v. Phila., 14 Phila. 223: "It has been repeatedly determined both by the courts of this county and by the Supreme Court that this provision is not merely directory, but that it is in the highest degree mandatory, and binding upon all who deal with the city departments, officers or agents. The words are words of positive prohibition and constitute a perfect and unanswerable defense to the claim of every contractor which is not brought within the specified conditions: Bladen v. The City, 6 Phila. R. 586; s. c., 10 P. F. Smith 464; Parker v. The City, 11 Norris 401; Matthews v. The City, 12 Id. 147. In order to make the

city liable, not only must there be an appropriation, but a sufficient appropriation. Its responsibility cannot be made to extend beyond the amount actually appropriated." It follows that plaintiff and the other 129 separatists can never recover as if for services rendered during 1932; and it also follows that no mandamus should issue to compel reinstatement to a position for which there was not and is not, and never hereafter can be, an appropriation to pay for the services they say they were ready to perform.

The same conclusion must be reached under article V, section 2, of the Charter Act (P. L. 1919, page 591) which provides that "The director shall appoint such other officers and employees as may be provided for by ordinance." There is no legal right to go beyond the point fixed by the ordinance, and the courts are wholly without power to increase the number of municipal officials, or to direct payment to those not provided for by the ordinance. To require the mayor and director,—neither of whom were in office when the 130 men were separated from the force, as is now attempted by the 130 removed patrolmen, and as will, under agreement of the parties, be accomplished if the present judgment is affirmed,—to add 130 patrolmen to the existing force as of January 1, 1932, would be to require the doing of an illegal act, and this, of course, the courts will never do. To be entitled to be restored, the 130 would have had to find vacancies on the force in January, 1932, which they were then entitled to fill, and also, by the proper public officials and in the proper form of procedure, would have had to establish that fact and oust the intruders, before they could take the initial step towards reinstatement. There were no such vacancies either then or at any time since, and no step has ever been taken to oust the imaginary intruders into those offices. Where, as here, there is no vacancy in the department, and its personnel cannot legally be increased, a mandamus will not lie to add to the number of employees in the department.

No matter what may be thought of the actions of the director in this particular matter, for it the city cannot be held responsible. He was then acting in a governmental affair of the city, as distinguished from one that was a purely business matter, and in the former the city acted as an agent of the Commonwealth, and is not responsible either for the malfeasance or the misfeasance of its officer. In such cases the doctrine of respondeat superior never does apply: Scibilia v. Phila., 279 Pa. 549; Devers v. Scranton City, 308 Pa. 13; Szilagyi v. Bethlehem, 312 Pa. 260; Keim v. United States, 177 U. S. 290, 293. In every aspect of the matter, therefore, the peremptory mandamus directing that plaintiff be reinstated as a patrolman, was erroneously awarded.

One other matter should be adverted to. Every request, made by plaintiff at the trial, 35 in number, was unqualifiedly "affirmed." If the trial judge believed they were correct, as it is to be presumed he did, this is not an objectionable practice. Each of those requests is also repeated in haec verba as individual findings by the trial judge, and none others are. This also is not, when standing alone, an objectionable though a wholly unnecessary practice. On the other hand, 30 of defendant's requests, are each marked "refused as drawn," without any statement as to what that means, in the case of any one of those requests. This is objectionable practice. We had occasion to point this out in the case of requests for findings in equity, and finally cured the evil by Equity Rule 71. If this course is persisted in in the present class of cases, a like summary remedy will have to be applied. It is the duty of the court below to let us know what it means by its answer to every request submitted to it, and this "refused as drawn" does not do as to any of them. Moreover, answering the requests of the two parties, in the way here appearing, tends to bring the administration of law into disrepute. The every-day-man, if he happened to learn of the facts to which we have adverted in this paragraph, would not un-

likely conclude that the trial judge had taken sides in the controversy; or was too indolent to fully answer the points. Of course, such a possibility should be most carefully avoided.

The judgment of the court below is reversed and judgment is here entered for defendants.

DISSENTING OPINION BY MR. JUSTICE MAXEY:

The discharge of policemen in the City of Philadelphia is clearly regulated by statute. Section 18 of the Charter Act of June 25, 1919, P. L. 581, provides: "No police officer or fireman, except those dismissed *during probationary period,* shall be removed or discharged, except for cause, upon written charges, and after an opportunity to be heard in his own defense."

The civil service commission has exclusive authority to determine what constitutes cause for any or all removals or dismissals: McCoach v. Phila., 273 Pa. 317, 117 A. 71; and Souder v. Phila., 305 Pa. 1, 156 A. 245.

In Essinger v. New Castle, 275 Pa. 408, 119 A. 479, this court cited with approval the following from 2 Dillon on Municipal Corp. (5th ed.), page 805: "The purpose of the civil service statutes, and of other laws prohibiting the discharge of employees without cause assigned, notice, and a hearing, is to insure the continuance in public employment of those officers who prove faithful and competent, regardless of their political affiliations. These statutes are not intended to affect or control the power of the city council, or the executive officers of the city, to abolish offices when they are no longer necessary, or for reasons of economy." In the present case the then director of public safety of Philadelphia on December 14, 1931, proposed to the city council, sitting as a budget committee of the whole, that he could effect a saving in his department by eliminating 130 positions in the bureau of police and 100 positions in the bureau of fire. This was agreed to by the council.

At that time there were 179 vacancies in the bureau of police and 70 in the bureau of fire.

On the following day the director began making appointments of probationary patrolmen to fill the police vacancies, and between December 15th and December 31, 1931, he appointed 179 probationary patrolmen. After the then director knew that the ordinance fixing the number of patrolmen at 4,400 had been reported favorably by the entire council, sitting as a budget committee, on December 29, 1931, and although he had in excess of 4,400 patrolmen on the rolls at that time, he nevertheless appointed 42 new patrolmen on December 30th, and 8 new patrolmen on December 31st. The court below found, on abundant evidence, "that the then director first had knowledge that the personnel of the bureau of police for the year 1932 would have to be reduced, on December 10, 1931, and notwithstanding such knowledge he thereafter appointed 179 patrolmen, filling up the ranks of 4,530 patrolmen, and then arbitrarily selected for discharge 130 patrolmen."

The form, i. e., the "mechanics" of the act of the director in eliminating 130 policemen as an economy measure, has the *appearance* of *legality,* but when we look below the surface, the act has the *substance* of *illegality* and is exposed as an attempt to take away the protection the statute has placed around a policeman's job. Any court has a right to look behind the mere form or appearance of an act to find out what lies behind it and what its substance is. Chief Justice SHAW aptly said in Com. v. Hunt et al., 45 Mass. 111: "The law is not to be hoodwinked by colorable pretenses; it looks at truth and reality through whatever guise it may assume."

The evidence shows that the plea of economy made by the director as a justification for the removal of these patrolmen was only a "guise" for the evasion by him of the Civil Service Law. If he was interested only in economy, why should he during the sixteen days next ensuing after he made the "economy proposal" appoint 179 new

policemen? There was no "emergency" or anything else calling for it. None is even alleged. I think the evidence shows that the appointment of these policemen was made so that the director could at the end of the year for reasons satisfactory to himself eliminate from the police force 130 of the veteran policemen against whom apparently no charges could be filed which under the Charter Act would constitute cause for their dismissal. That they in fact received "honorable discharges" shows that they were not removed for legal "cause" within the meaning of the Charter Act. Seven of the policemen discharged had entirely clear records, i. e., they were never guilty of an infraction of any of the many rules of the department. Another discharged policeman was a man who on September 10, 1930, was chosen for the "Public Ledger" award of $1,000 for performing the outstanding feat of bravery in the department in that year. One of the policemen discharged not only had a clear record but also had commendations.

When questions similar to the one now before us have been before the courts of other states, they have not hesitated to determine whether or not an officer was discharged on the mere pretense that his office was to be abolished in the interests of economy or for some other valid reason. Courts undoubtedly have the power to inquire into the good faith of officials in taking such action as is complained of here. In People v. La Grange, 7 N. Y. App. 311, the court held: "The only question before the court was whether the action of the commissioners of the fire department in discharging the relator was a legitimate exercise of the power they possessed to abolish the office he held and thereby dispense with his services, or was a mere pretext to remove him in order that they might put some one in his place. It is manifest that the relator was discharged on the mere pretense that his office was to be abolished, and a man named McLewee was immediately assigned to do the same work that the relator had done. This man McLewee had been an em-

ployee of the fire department, filling a place which had been abolished by a resolution of the board, which resolution remained unrescinded at the time this relator was removed from his position, and it is painfully apparent that the relator was thrust aside simply for the purpose of retaining McLewee in the employment and under the pay of the board, although the place he had filled had been abolished."

In Throop on Public Officers, Book III, chapter XVI, section 347, is this statement: "But a power conferred upon police commissioners to remove subordinates for the purpose of reducing the force, cannot be exercised to create a vacancy for the appointment of another person."

In Garvey v. City of Lowell, 199 Mass. 47, 85 N. E. 182, the Supreme Court of Massachusetts said: "Accordingly, we can have no doubt that the judge rightly admitted the evidence which tended to show that the plaintiff's position was not abolished in good faith for reasons of economy, but that the vote of the board of health was a mere pretext or device to get rid of the plaintiff on account of his refusal to render political service to one of the members of the board; and the findings of the jury were fully warranted by the evidence."

It is conceded in the majority opinion, as Dillon on Municipal Corporations (pages 805, 806, 807, note) says: "The local authorities have no power to discharge an officer or employee of the city upon the pretense that his office is abolished and immediately thereafter assign another person to do the same work which had been done by the discharged employee." The answer made to that is: "Nor has that been done here." As I view it, it *was done*. There is to me no visible difference between the concededly illegal act of discharging 130 patrolmen on the ground of economy and then immediately afterwards appointing their successors, and the act done here, i. e., hurriedly "padding" the police force by more than 130 new appointments when it is known to the appointing

power that within two weeks, the police force will have to be reduced by 130, and then proceeding at the end of those two weeks to reduce the force by eliminating 130 veterans who have never been found guilty of any act warranting their dismissal from the force.

If the director had the legal right under the facts appearing in this record to substitute 130 new patrolmen for 130 veteran patrolmen against whom no charges had been preferred as provided by law for the removal of patrolmen, any director can by similar methods remove almost any number of patrolmen from a force. He can, for example, allow a force of 4,500 men to dwindle down to 3,500 men, and then successfully propose to the council that at the end of the year in the name of "economy" the force be fixed at 3,500 men, in the meantime appoint new patrolmen up to the then existing standard of 4,500 men, and at the end of the year, eliminate 1,000 of the veteran policemen. I would not allow article XIX (the civil service article) of the Act of June 25, 1919, supra, for the better government of cities of the first class of this Commonwealth, to be circumvented in this manner. Thus to treat faithful officers under the protection of the Civil Service Law is to flout its spirit and to thwart its purpose.

To uphold the act of the director as illegal and void we do not have to impugn the good faith of the mayor and city council then in office. It was the director, who on December 14, 1931, suggested a saving in his department by the elimination of 130 patrolmen positions and 100 firemen positions. The council naturally and properly accepted such a proposal from the head of the department of public safety as he was in a better position than they were in to determine the police requirements of Philadelphia. This councilmanic acceptance of the director's "economy plan" and the further fact that the actual number of policemen on the force was at that time 179 less than the then legally permissible quota of 4,530, afforded the director his obviously desired opportunity

to dismiss arbitrarily from the force 130 policemen whose records in the department were barren of any legal excuse for a policeman's removal. This opportunity was eagerly grasped and during the same sixteen-day-period the director was with one hand selecting 130 veterans to be removed, and was with the other hand selecting 130 raw recruits to take their places. Such autocratic action, if unreversed, makes this Commonwealth's promise in the Civil Service Law that "no police officer shall be removed except for cause, upon written charges and after an opportunity to be heard in his own defense" just another "scrap of paper."

As this is a suit for mandamus asking for the reinstatement of patrolmen, it is not necessary to discuss the question as to where the money is coming from to pay them for the services which they have been ready and willing to perform since the date of their illegal removal. That question is not before us. The question whether there was "a previous appropriation by the council" to pay for the services of these policemen has no more to do with the question before us than the question of an appropriation for the satisfaction of a judgment which a plaintiff might be seeking against the City of Philadelphia for an alleged breach of contract would have to do with the question: Was there a breach of contract? There might be a breach of contract by a city or an individual and there might be a resulting liability and yet this liability might be unenforceable for lack of funds. It is a fair assumption that there was at all times "a previous appropriation" covering the salaries of policemen, and as these appellees were policemen and not legally removed, they would be entitled to their share of that appropriation. If the appropriation has all been consumed before they were paid, that fact would not affect their status as policemen. An illegal removal of a policeman does not become legal simply because after the illegality of his removal is established, there are no funds presently available for his back pay. For ex-

ample, if there were no funds available to pay the police-men of Philadelphia for their services during the current year, that would not automatically remove them from their positions any more than a failure on the part of the state legislature to provide funds for the payment of the salaries of the governor and of the judges of the courts would automatically remove them from office. What will our Civil Service Law amount to if those protected by it are to be removed arbitrarily and without trial, and then when they come to the courts, suing for rein-statement, they are to be told that their suits must fail because the appropriation for their salaries has all been consumed and no new appropriation for such salaries can be made?

We are here and now concerned only with the removed policeman's right to their position of policemen. We are not concerned with the question of the liability of the city for their back salaries and certainly not concerned with the question where the money will be obtained to pay these back salaries. I have no doubt that these policemen are more concerned with being reinstated to their positions from which they were illegally removed and their future employment as policemen than they are with the question of "back pay." The legal rights of these policemen have clearly been invaded and they are entitled to judicial protection against that invasion. No one in this Commonwealth has ever challenged the state-ment of Blackstone in Book 3, chapter 3, that "it is a general and indisputable rule, that where there is a legal right there is also a legal remedy, by suit or action at law, whenever that right is invaded."

In Storm v. City of Scranton, 77 Pa. Superior Ct. 283, it was held that a fireman in the fire department of a city of the second class, can only be dismissed upon his own written consent, or after trial in accordance with the provisions of the Act of March 7, 1901, P. L. 20; and that in the absence of any evidence of such dismissal, one thus employed and ready to give his services to the city

may recover the salary incident to the position to which he was appointed.

In Jenkins v. Scranton, 205 Pa. 598, 55 A. 788, this court held that where a person was appointed collector of delinquent taxes in a city of the second class, and subsequently the city treasurer was appointed to the same office, and the first appointee was not formally removed by the city recorder and there was neither proof nor an attempt to prove that he was ever notified by the recorder that he had been removed, the first appointee is entitled to receive the salary of the office.

The evidence fully warrants the 21st finding of fact of the court below "that the appointment of the then director of 179 probationary patrolmen between December 15th and December 31, 1931, when he had knowledge that the personnel was to be reduced from 4,530 to 4,400 for the year 1932 was an effort by the director to fill up the ranks to the number of 4,530 in order to permit him to later remove by apparently lawful means the 130 men whom he removed, when he should have refrained from making any appointments over the number of 4,400."

The evidence fully warrants the court below in stating in its 22d finding of fact that the then director "resorted to the subterfuge of making 179 appointments when he knew the personnel was to be reduced for the year 1932."

The evidence fully warrants the 23d finding of fact of the court below that "dismissal of the plaintiff and 129 other officers for alleged reasons of economy cannot be justified when 179 probationers were appointed, who had no uniforms or equipment and who could not do police duty for 90 days, while the 130 officers who were dismissed were veterans, some for 18 and 19 years, and had experience, uniforms, and the necessary equipment to function as police officers."

I agree with all the conclusions of law of the court below, and I cite particularly the following:

"4. The director of the department of public safety did not dismiss the plaintiff in good faith for reasons of

economy, because if he did he would not have appointed 179 new probationers. He merely used the pretext of economy and reduction in personnel for the purpose of dismissing the plaintiff for his own personal reasons.

"5. The plaintiff was dismissed not because of the reduction in personnel or for reasons of economy, but merely to make way for a probationary appointee of the then director."

"10. The then director of the department of public safety appointed 179 probationary patrolmen for the purpose of enabling him to thereafter dismiss the plaintiff and the other 129 patrolmen, and such action on the part of the director is illegal and plaintiff has been illegally dismissed and is entitled to be restored to his position."

The majority opinion invokes the doctrine that when an official of a municipality is acting in a governmental affair of the city, the city is not responsible for such an official's malfeasance or misfeasance. This doctrine has no application whatsoever to a case like the one now before us. It applies to actions in trespass for damages against a municipality. The various cases cited by the majority opinion in support of this proposition demonstrate this to be the fact. For example, in Devers v. City of Scranton, 308 Pa. 13, 161 A. 540, cited in the majority opinion, the appellant sued in trespass to recover damages for the death of his adult son who was run down and killed by a motor-driven fire ladder truck of the city. This truck was operated by a member of the paid fire department and was responding to an alarm. The trial judge entered a nonsuit on the ground that the municipality was not liable in damages for the negligent operation of its fire trucks while responding to a fire. The order of the court below was affirmed. Szilagyi et al. v. Bethlehem, 312 Pa. 260, 167 A. 782, cited in the majority opinion, was also an action in trespass. This court there held that a municipality could not be held liable by unpaid laborers or materialmen for the municipality's fail-

ure to procure statutory bonds to protect labor and materialmen. Scibilia v. Phila., 279 Pa. 549, 124 A. 273, also cited in the majority opinion, was an action against the municipality for the tort of one of its servants, to wit, the driver of a truck of the street cleaning department of the city. It was held that the city was not liable. If the appellee in the present case was suing the City of Philadelphia because Director Schofield, while proceeding in his car on official business, ran over the appellee and injured him, it would be a case analagous to those cited in the majority opinion. No one questions the doctrine that torts cannot arise from the performance of governmental services. The appellee is complaining not of a tort, but of the taking away of his statutory right to a public position. The present proceeding is a suit for mandamus for reinstatement in a position from which the petitioner was arbitrarily removed without legal authority or power by the director of public safety. The action of the director of public safety in attempting to remove these police officers is, in my judgment, as much a nullity as would be the action of the governor should he attempt to remove judges from the offices to which they have been commissioned. Judges are protected in their right to office by the Constitution and they can be removed only in the manner provided by it. Likewise, policemen are protected in their right to their positions by the statutes of Pennsylvania, and they can be removed only in the manner provided by law. It was said by Chief Justice MARSHALL in Marbury v. Madison, 5 U. S. 137, 162: "Mr. Marbury, then, since his commission was signed by the president, and sealed by the secretary of state, was appointed [justice of the peace]; and as the law creating the office gave the officer a right to hold for five years, independent of the executive, the appointment was not revocable, but vested in the officer legal rights, which are protected by the laws of his country. To withhold his commission, therefore, is an act deemed by the court not warranted by law, but violative of a vested

legal right. . . . . . . If he has a right, and that right has been violated, do the laws of his country afford him a remedy? The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection."

This court has heretofore not hesitated to protect public officers from attempted illegal removals. In the case of Com. ex rel. Attorney General v. Benn, 284 Pa. 421, 131 A. 253 (1925), this court decided that the Act of July 25, 1913, P. L. 1374, which provided that the governor, by and with the consent of the senate, may remove any public service commissioners, is exclusive, and does not give the governor an alternative or additional method of procedure in removing commissioners, even though article VI, section 4, of the Constitution does provide that appointed officers, other than judges of the court, may be removed at the pleasure of the power by which they shall have been appointed. In the recent case of Souder v. Phila. et al., 305 Pa. 1, 156 A. 245, Mr. Justice KEPHART, in his dissenting opinion, said: "Police officers devote their services to the government, they have a distinct valuable property in their employment. It should be protected and preserved against an unfounded attack. The city charter of Philadelphia recognizes this obligation to these officers and this court has recognized it by protecting them from unwarranted attack. The principle was asserted that no officer should be dismissed from service unless it was for a cause not only charged *but proved*. There is no reason why the rule of conduct so well expressed by the majority opinion should not apply to every public office holder." The majority opinion in that case was not at variance with this quotation from Justice KEPHART'S opinion. The majority opinion held that the Civil Service Commission of Philadelphia had a right to consider and pass not only upon the question of wrongdoing alleged against an officer of the po-

lice, but also upon his conduct in its bearing on the discipline of his subordinates and upon the discipline and morale of the entire force, and that what constitutes cause for removal must necessarily be a matter of discretion in the commission. See Com. v. Phila., 273 Pa. 332, 117 A. 180, and McCoach v. Phila., 273 Pa. 317, 117 A. 71.

Another case cited in the majority opinion but which is wholly inapplicable here is that of Keim v. United States, 177 U. S. 290. In that case an employee of the department of the interior was discharged because his rating was inefficient. It was held that the courts of the United States could not supervise the action of the head of the department of the interior in discharging him. It was also held that the law nowhere conferred upon the courts the right to supervise the results of a civil service examination or to investigate the actual work done by the various clerks so that their relevant competency may be determined. In that case Mr. Justice BREWER said: "These are matters peculiarly within the province of those who are in charge of and superintending the departments." He cited section 3 of the Act of August 15, 1876, 19 Stat. 169, which gives the heads of the departments, the right to assign to a clerk of a lower class the duties theretofore assigned to a clerk of another class, etc. Justice BREWER also cited section 7 of the United States Civil Service Act of 1883, 22 Stat. 406. He said: "These sections do not contemplate the retention in office of a clerk who is inefficient, nor attempt to transfer the power of determining the question of efficiency from the heads of departments to the courts."

In the case now at hand there was no charge of inefficiency and no complaint about the rating of the policemen, and it appears on the record that the Civil Service Commission of Philadelphia disapproved of the removal of these policemen. If there was any legal reason for their discharge the law of Pennsylvania provides a method for doing so. This method was not resorted to.

The director arbitrarily selected the policemen to be removed. He had no more right to do this than he had to select for removal any other policeman whose right to his position is guaranteed by the Civil Service Law, and who can be removed only by due legal process.

Here then we have before us an act by the director of public safety not only in utter disregard of the laws of the Commonwealth, but contrary to the will of the Civil Service Commission of Philadelphia. It is on this record that at a regular meeting of the commission the matter of the removal of these officers was considered by the commissioners and they were unanimous in their conclusion that the officers were illegally dismissed, and that the director had no right to discharge any of them. Furthermore, the civil service commission, on petition by the plaintiff, conducted a public hearing, and ordered and decreed that the plaintiff and 112 of these patrolmen be reinstated, the other 17 of the 130 patrolmen having been placed on the pension list. I cannot conceive of a plainer violation than that now before us, of the law (Act of June 25, 1919, P. L. 581) that "no police officer, except those dismissed during probationary period, shall be removed or discharged, upon written charges, and after an opportunity to be heard in his own defense."

I believe that the language of Judge CARDOZO in People v. Williams, 213 N. Y. 130, 107 N. E. 49, is applicable here: "We think that if a new position, similar to the relator's, was created at the same time that the relator's was abolished, the commissioner was required, in filling the new position, to prefer the relator over others. The law will not permit him, for the purpose of ousting the relator and installing some one else to reduce the positions with one hand and increase them with the other. ...... The commissioner makes no claim that he intended that the new men should succeed to any specific position from among the total number of positions ostensibly abolished. If it cannot be said with certainty that either of them took the place of the relator, it cannot be

said with any greater approach to certainty that they took the place of any one else. All that we can say with certainty is that in the very act of declaring some 10 or 12 places unnecessary and abolished, two new places of the same nature were created; and the relator, because of his preferred right to reinstatement, was entitled, in our judgment, to be appointed to one of them. To deny to him that measure of preference would do violence alike to the spirit and to the letter of the statute."

I would affirm the judgment of the court below.

DISSENTING OPINION BY MR. JUSTICE DREW:

I am unable to agree with the reasoning or the conclusion reached by the majority in this case. In order to make my position clear, it is necessary to restate the facts, because to my mind several material features of the case have been omitted or not given their proper weight in the majority opinion.

Under the civil service provisions (Article XIX) of the Philadelphia Charter Act of June 25, 1919, P. L. 581, patrolmen may be appointed, except in an emergency, only from lists of those eligible, compiled after competitive examination by the civil service commission of the city. On August 14, 1931, Lemuel B. Schofield, then director of public safety, requested the civil service commission to hold an examination and provide him with an eligible list in order that he might fill a number of vacancies in the quota of patrolmen—at that time 4,530—before his term of office should expire on January 1, 1932. Because of the delay attendant upon the examination and grading of the applicants, this list was not delivered to Director Schofield until December 14, 1931. No appointments were made to the police force between August 25th and December 15th, and there were on the latter date 179 vacancies in the ranks of patrolmen. Neither during that time nor during the remainder of the year was there any emergency requiring the appoint-

ment of additional patrolmen, nor was there any legal obligation upon the director of public safety to do so.

In the meantime, on December 10th, it had become evident to the municipal authorities that, because of the financial condition of the city and the undesirability of raising the tax rate, it would be necessary to cut the appropriations of the various city departments for the coming year. On December 14th, the same date that he received the eligible list from the civil service commission, Director Schofield proposed to the finance committee of the city council, at a session devoted to the preparation of the city budget for 1932, that a saving of over $800,000 be effected by the reduction of the number of patrolmen from 4,530 to 4,400, and by similar reductions in the fire department and other subordinate divisions of the department of public safety. This recommendation was immediately adopted by the finance committee and was incorporated in its report on the budget on December 29th; the budget ordinance, containing these reductions, was passed by council on December 31st and was signed by the mayor on the same day.

Nevertheless, *although he had already recommended the reduction of the number of patrolmen by 130, and knew that his suggestion had been accepted by the finance committee,* Director Schofield proceeded to make appointments from the list furnished him by the civil service commission, and he thus filled, between December 15th and the end of the year, all of the 179 vacancies existing on December 15th. Of these appointments two were made on December 29th, 42 on December 30th, and eight on December 31st. He actually filled 50 vacancies after council had acted upon his own recommendation to reduce the force. All these appointments were provisional only; section 15, of Article XIX, of the Charter Act requires that all new appointments be for a probationary period of three months, and provides that "if during that period the service of that officer or employee is unsatisfactory, the appointing officer shall notify him

in writing that he will not be retained in the public service after such three months' period. If not so notified, his appointment shall become permanent at the end of the three months' probationary period." The discharge of appointees during the probationary period is provided for by the rules of the civil service commission (which by section 13, of Article XIX, have the force and effect of law), which state: "A probationer may be removed at any time within the three months by the same procedure prescribed for the removal of employees who have received final appointment." The method of removing policemen who have completed their probationary period and become permanent employees is prescribed in section 18, of Article XIX, which provides: "No police officer or fireman, except those dismissed during probationary period, shall be removed or discharged, except for cause, upon written charges, and after an opportunity to be heard in his own defense. Such charges......shall, within thirty days after filing, be heard, investigated, and determined by the commission."

Having thus filled every available vacancy in the quota for 1931 of 4,530 patrolmen by 179 new appointments in his last two weeks in office, Director Schofield was required by the action of council, approved by the mayor, to reduce the force by 130 men to 4,400, in order to meet the provisions of the budget for 1932. This he attempted to do by peremptorily discharging—not a single one of the probationers just appointed—but 130 permanently appointed service men, whom he hastily picked by examining the records of about one-half of the patrolmen. On December 29th he had letters printed, which on December 31st were sent to the discharged men, including plaintiff, in notification; in them, it was stated that the discharge was an honorable one and was necessary because of the reductions in the budget of the department for 1932. In his testimony Director Schofield stated, as his reason for choosing the men he did, that he wished to separate from the force those men whom it could "best

afford to lose." However, the records of the discharged men, which were printed with the testimony, show that none were probationers, while some were veterans of 18 or 19 years' experience, that among them was one who had won in the previous year the annual public award for the outstanding feat of bravery on the police force, and that others had absolutely clear records. The evidence amply supports the finding of the learned trial judge that the appointment by the director of probationers when he knew the force would have to be reduced was a mere subterfuge resorted to by him in order that he might later discharge, upon the pretext of economy, men whom he could not otherwise remove from the service and whom he wished to dismiss for personal reasons.

On January 14, 1932, the president of the civil service commission, without consultation with the other two members of the commission, sent a form letter to the city controller, approving the separation from the police force of the 130 men discharged by Director Schofield. This was done because such approval was necessary in order that the city payroll be not held up. On January 19th, the new director of public safety, Kern Dodge, who had taken office on the first of the year, sent to the civil service commission, at its request, a new list of the men discharged, together with their records. At that time, Director Dodge testified, he approved the action of his predecessor because of the bad records of the men discharged, although he admitted that he made no check or comparison of their records with those of the others remaining on the force. In accordance with the rules of the civil service commission, these men, since they had been honorably discharged, were placed on a "preferred list," to which preference was to be given in making appointments during the following year. However, because of the financial difficulties of the city, which continued throughout 1932, no appointments were made to the police force, although a number of vacancies occurred. Finally, on December 28, 1932, the civil service

commission, after efforts to have the discharged men appointed to the existing vacancies had failed, and since their status as preferred applicants was about to expire, formally withdrew the letter sent by the president on January 14th and ordered the director of public safety to reinstate on the force all the men on the preferred list, creating vacancies by promotion, if necessary to do so. There were at this time 87 vacancies among the ranks of the patrolmen. With the order of the civil service commission the director of public safety refused to comply, and this action followed.

The decision of the court below was based on the ground that, inasmuch as there were more than 130 vacancies when Director Schofield proposed to abolish that number of positions, petitioner's position was not abolished by the budget ordinance putting that proposal into effect, and, therefore, the discharge of petitioners was not, in fact, made for reasons of economy, but merely to make way for a probationary appointee of the director. For such reason, the court held, the director was without authority to dismiss petitioner, and he could lawfully be removed from his position only by the civil service commission, following the procedure established in Article XIX of the Charter Act.

It would at once seem that this denial of the right of the director to remove patrolmen whom he had the power to appoint, and the giving of the power of removal to the civil service commission, as provided by the Charter Act, is in direct violation of the provision of Article VI, section 4, of the Constitution, that "Appointed officers, other than judges of the courts of record, and the Superintendent of Public Instruction, may be removed at the pleasure of the power by which they shall have been appointed." However, as we have often said, this provision applies only to officers in whose offices are vested important public duties and functions (Houseman v. Com., 100 Pa. 222; Arthur v. Phila., 273 Pa. 419; see Richie v. Phila., 225 Pa. 511, and 37 Pa. Superior Ct.

190), not to mere subordinate ministerial agents or employees, who are petty officers, and therefore subject, as to appointment and removal, to legislative regulation: Com. v. Black, 201 Pa. 433; see Duffy v. Cooke, 239 Pa. 427; Georges Twp. School Directors, 286 Pa. 129. Thus, in Com. v. Black, we expressly held that a policeman of a third-class city, who was appointed by the mayor, could not be removed by the mayor without the consent of the city council, inasmuch as the governing act of assembly required such consent for dismissal. The case is directly in point, and it must therefore be regarded as settled that, so far as petty ministerial officers such as policemen are concerned, civil service statutes regulating the method of dismissal are effective and not in contravention of the Constitution.

The opinion of the majority is based upon the ground that as the quota of patrolmen was full on December 31, 1931, it was necessary to discharge 130 patrolmen in order to come within the limits fixed for the year 1932, and the removal of petitioner and those discharged with him was thus dictated by the abolition of 130 positions. Under these circumstances, it is held, where dismissals must be made in order to reduce the number of employees, civil service limitations upon the discharge of employees have no application, and Director Schofield, as the appointing officer, had the power to remove those whom, in the exercise of his discretion, he chose. The principle thus relied on is well established; since the number of patrolmen had to be reduced for reasons of economy, the director, as the appointing officer, had the right to remove, without the presentation of charges and a hearing, as many men as was necessary. I cannot agree, however, that this power vested in the director gave him any authority to act as he did in the instant case. As I see it, his action was not a mere breach of discretion, but an attempt to accomplish by apparently legal means that which he had no right or power to do.

When, with the approval of the budget ordinance on December 31st, the director had to reduce the number of policemen by 130, there were, in the ranks from which he had to choose, 4,351 permanent service patrolmen, and 179 new probationary patrolmen. As provided in the Charter Act, these new men, until after they had completed a three months' probationary period, could be removed without trial. I would hold, therefore, that when it became the duty of the director to reduce the force, it was incumbent upon him first to discharge those who had not yet become permanent employees of the city, and who could in any event be removed without a trial. Since the number of probationers exceeded the number by which the force was to be reduced, all the removals should have been made from among them. When the director, instead of removing 130 probationers—who, under the circumstances, should never have been appointed in the first place—attempted to remove 130 veterans, he exceeded the right of choice given to him. I think he had no right to do what he did, and that his action in attempting to remove petitioner should be held illegal and of no effect.

In my opinion, Director Schofield's action was a clear violation of the civil service provisions of the Charter Act. The most important principle and fundamental object of all civil service laws is the protection of public servants in their employment and the prevention of their removal therefrom by unfair means. If broken down in this primary respect, such laws will have no value. As already shown, the civil service provisions of the Charter Act give complete protection, so far as removal without trial is concerned, to the classes of public servants named therein. The only exception to this protection is that which results from necessary reduction of personnel for reasons of economy. But certainly this well-known principle should not be unnecessarily carried to the extent of destroying the basic feature of the Civil Service Law. That is exactly the result of this decision sustaining the

action of Director Schofield, because he deliberately took from the rolls of his department men who were protected in their employment by the Civil Service Law, while at the same moment keeping on those rolls a greater number of men who did not have that protection, but were probationers, subject by the terms of the Civil Service Law itself to removal without trial and without the assignment of any reason. The action of the director was destructive of the fundamental object of the law. Under the facts of this case I would hold that it was the director's bounden duty to remove from the ranks of the probationers a sufficient number to comply with the mandate of the city council, and that his action in removing veteran employees protected by the civil service, even under the pretense of having done so for reasons of economy, was illegal and of no effect.

Nor can I agree with the majority in holding that the judgment must be reversed because there is no appropriation for plaintiff's salary, and that to order his reinstatement would be to enforce a liability against the city without an appropriation having been made to meet it. No such question of payment is involved in the instant proceeding; the question now before us is whether plaintiff is entitled to reinstatement, not whether he can, if reinstated, obtain payment for his services. Whether plaintiff can require the city to pay him for the period of his improper suspension is in this action entirely immaterial. The sole question here is the right of the plaintiff to be returned to an office from which he was never legally removed. To grant the plaintiff the mandamus which he seeks would not be holding the city responsible for the wrongful act of the director, but would merely restore him to the place from which the director had no power to remove him. This argument of the majority seems to me a clear misapplication of the rule that a municipality is not to be visited with liability for the wrongful acts of its representatives or employees. In Scibilia v. Phila., 279 Pa. 549; Devers v. Scranton, 308

Pa. 13, and Szilagyi v. Bethlehem, 312 Pa. 260, relied upon by the majority, it was attempted to hold the defendant municipality liable in damages for the torts of its officers and employees done in the performance of a governmental function; it is well settled that this cannot be done. The other case relied upon by the majority, Keim v. United States, 177 U. S. 290, is not, in my view, even authority for that proposition; the Supreme Court of the United States there held that "In the absence of specific provision to the contrary, the power of removal from office is incident to the power of appointment," and that therefore the discretion of an appointing officer in removing a subordinate clerk on account of inefficiency was "beyond review in the courts either by mandamus to reinstate him or by compelling payment of salary as though he had not been removed." Here, of course, there is specific statutory provision regulating the power of the director of public safety to remove police officers. The principle of our cases cannot logically be so extended as to deny one wrongfully removed from office the right to reinstatement. The enforcement of that right by an action of mandamus is a familiar remedy (Dillon, Municipal Corporations [5th ed.], section 487; 19 R. C. L. 940), which we should not thus casually destroy. Since, as I see it, Director Schofield had, by the plain provisions of the Charter Act, no power to discharge the plaintiff in the way he did, his attempt to do so was absolutely nugatory, and plaintiff should be reinstated. So far as the instant proceeding is concerned, this would place no liability upon the city. It means only the return of the plaintiff to the position from which he was never legally discharged.

For the reasons given above, I would affirm the judgment rendered below.