Mastrangelo et al., Appellant, *v.* Buckley et al., Appellant.

354

356

Argued January 16, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

reargument refused February 20, 1969, Mr. Justice COHEN dissenting.

*Edward G. Bauer, Jr.,* City Solicitor, with him *Matthew W. Bullock, Jr.,* Second Deputy City Solicitor, and *Frank J. Pfizenmayer,* Assistant Deputy City Solicitor, for City, defendant.

*Edward R. Becker,* for plaintiffs.

*John R. McConnell,* with him *Thomas M. Kittredge,* and *Morgan, Lewis & Bockius,* for School District, defendant.

*Arthur E. Newbold, IV,* and *Robert M. Landis,* for Greater Philadelphia Movement, intervenor.

*Gregory M. Harvey* and *Thomas V. Lefevre,* for Greater Philadelphia Chamber of Commerce, amicus curiae.

*Arlin M. Adams,* with him *Ira P. Tiger,* and *Schnader, Harrison, Segal & Lewis,* for interested parties.

OPINION BY MR. JUSTICE JONES, February 7, 1969:

These are appeals from a decree of a three-judge panel of the Philadelphia Court of Common Pleas[1] enjoining the City of Philadelphia from enforcing certain revenue measures adopted by the City Council and approved by the Mayor on December 26, 1968, enjoining the enactment of certain appropriation transfer ordinances introduced in City Council on the same day and dissolving an injunction as to two revenue measures for the School District of Philadelphia.

The genesis of this litigation goes back to December, 1967, when the City Council and Mayor approved an eighteen-month operating budget commencing on January 1, 1968, and terminating on June 30, 1969.[2] The purpose of the eighteen-month budget was to convert the City from a calendar fiscal year commencing on January 1 to a fiscal year commencing on July 1. The total appropriations under this budget were estimated at $585,202,000, and anticipated revenues were estimated at $609,681,000. The difference between these two figures, $24,479,000, was allocated as "working capital surplus."

Meanwhile, the School Board of Philadelphia, which was already operating on a fiscal year beginning on July 1, submitted to the Mayor and City Council on April 3, 1968, its anticipated budget for the fiscal year

---

[1] Judge SMITH wrote the majority opinion, in which Judge BARBIERI concurred. Judge BARBIERI also filed a concurring opinion. Judge SPAETH filed an opinion concurring in part and dissenting in part.

[2] This Court upheld the eighteen-month budget by a 4-3 vote in *Phillips v. Tate,* 431 Pa. 124, 244 A. 2d 774 (1968).

beginning on July 1, 1968. Since its proposed expenditures exceeded its anticipated revenues by $33,945,926, the Board asked the Council for authority to levy taxes to collect this amount.[3]

On December 5, 1968, eight interim tax measures were introduced in City Council to raise money for both the City and the School District.[4] The money for the School District was required to eliminate the deficit which had already been anticipated in the budget for the fiscal year commencing on July 1, 1968. The interim taxes for the benefit of the City, anticipated to yield $13,750,000, were, allegedly, necessitated by two unexpected expenses: first, the City had signed a new contract with the City policemen, firemen and non-

[3] The School Board is authorized to levy taxes with the approval of the General Assembly of the Commonwealth or of the City Council under Section 12-305 of the Educational Supplement to the Home Rule Charter.

[4] Bill No. 822—Raising the fine for parking violations from $3.00 to $6.00.

Bill No. 823—Increasing the fines for parking meter violations from $3.00 to $6.00.

Bill No. 824—Increasing the City's Mercantile License Tax from three (3) mills to four (4) mills per dollar on gross receipts.

Bill No. 825—Increasing the tax on outdoor parking lots from 10% to 20%, imposing such tax on the patrons rather than the proprietor and extending said tax to indoor parking facilities and imposing the duty of collection upon the proprietor.

Bill No. 826—Decreasing the rate of the real estate tax for use by the City of Philadelphia by $.55 from $2.375 to $1.825 per $100 of assessed valuation.

Bill No. 827—Increasing the Wage and Net Profits Tax from 2% to 3%.

Bill No. 828—Authorizing the School District to impose a tax of five cents (5¢) per share on all sales, transfers and deliveries of shares or certificates of stock in Philadelphia.

Bill No. 829—Authorizing the School District of Philadelphia to raise its real estate tax from $.42½ to $1.10 on each $100 of assessed value of real estate.

uniformed employees which, it was estimated, would require the expenditure of an additional $12,809,400; second, the remaining amount was to be used to defray the increased cost of running the judicial system in the City resulting from the consolidation of the various courts brought about by the amendments to the State Constitution effective January 1, 1969.

On December 26, 1968, all eight revenue measures were approved by the Council and signed into law by the Mayor. On the same day, fourteen appropriation transfer bills were introduced into Council. Thirteen of these transfer bills were designed to transfer most of the budgeted surplus of approximately $24 million from the "working capital surplus" to various City departments. The City Finance Director subsequently testified that, during the course of 1968, various City department heads requested permission to exceed their budgets because of unforeseen expenses and, when the Finance Director was satisfied that these expenses were necessitated, he authorized the department heads to exceed their budgets with the promise that he would ask City Council to reimburse them from the budgeted surplus. It was also decided that the Council would not make the transfers to the departments piecemeal but would wait until the end of 1968 to make all the transfers at one time. The result was the thirteen appropriation bills introduced on December 26. The fourteenth and final transfer bill appropriated $12,809,400 of the anticipated $13,750,000 to be raised by the new tax measures to the Finance Director to cover the new salary increases and the balance to the Finance Director for working capital.[5]

Meanwhile, on December 19, 1968, appellees, in the capacity of taxpayers of the City of Philadelphia, filed

---

[5] The Finance Director testified that this money was to be used to defray the increased expenses of the City's courts.

suit against the City to enjoin collection of the new taxes. On December 31, a three-judge panel convened to hear the case enjoined the City from collecting the taxes and fines imposed by the revenue bills and from enacting the appropriation transfer bills. The court ruled, in effect, that the City had not established that the revenues to be raised by the new taxes were to meet "unanticipated emergencies" as required by §2-301(a) of the Philadelphia Home Rule Charter. Two days later the Council held a hearing after which it passed a resolution finding specifically that the needs of the School District and of the City for the wage increases and for the court consolidation costs were "unanticipated emergencies" and that the appropriation transfer bills "provide for the payment of expenses which were unanticipated and could not reasonably be anticipated, and in very large measure were of an emergency nature, and are properly within the budget provisions of the Home Rule Charter authorizing transfers in appropriations." The City went back to the Common Pleas Court to ask that the injunctions be dissolved.

The lower court handed down its opinion and order on January 9, 1969. The three judges unanimously held that the injunction pertaining to the two tax measures for the benefit of the School District should be dissolved. As to the tax measures for the City, the court was divided. Judge SMITH, writing for the majority, held that the City lacked the power to pass interim tax measures and that the transfer bills—with the exception of the bill transferring the money for the salary increases—were also invalid because dissolution of the budgeted surplus would create a deficit. Judge BARBIERI, in a concurring opinion, argued that the funds to be transferred under the appropriation bills were not for "unanticipated emergencies," that

the pay increases and increased costs of administering the courts should be paid for out of the operating surplus and that, therefore, there was no deficit and no "unanticipated emergency" requiring additional revenues. Judge SPAETH dissented to this part of the majority's opinion, contending that the City had the right to pass interim tax measures, that the expenses of the pay raises and of the court system were "unanticipated emergencies" and that at least some of the budgeted surplus was not available for this emergency since the money had already been committed to various City departments. Judge SPAETH would have remanded the matter to Council for a determination as to which of the monies proposed to be transferred had, in fact, already been committed to the various departments. Finally, Judge SPAETH criticized the majority's order upholding Bill No. 829 authorizing the School District to raise its real estate tax from $.42½ to $1.10 on each $100 of assessed value and at the same time striking down Bill No. 826 decreasing the rate of real estate tax for use by the City from $2.375 to $1.825, pointing out that the result of the majority's decision was to increase the real estate tax by $.67½ on each $100 of assessed valuation, whereas the City Council had only intended to raise the rate by $.12½.

The City has appealed to this Court. The Greater Philadelphia Movement and the Philadelphia Chamber of Commerce have intervened in support of the City's position. Fogel's Garage, Inc., and Donna M. Yokum, owners of public garages in Philadelphia, have also intervened. In so intervening, they maintain that, in the event that we uphold the Council's right to pass the tax measures, we, nevertheless, must strike down Bill No. 825 increasing the tax on outdoor parking lots from 10% to 20%. Fogel and Yokum have also filed

a separate action attacking the validity of Bill No. 825.

### The Authority of the City To Enact Interim Taxes

In our approach to the resolution of the instant controversy, we bear in mind the salutary rule that the judiciary should not intrude into the legislative area of government unless it be demonstrated that the legislative body—in the present case the City Council— has acted in a manner violative of our Constitution, Acts of the General Assembly or the organic law of the City (the Home Rule Charter) or in a manner wherein the Council lacks the power or authority to act. The *wisdom* of the councilmanic action is not within our judgment; we only review the legal validity of such action. We do not and should not act as a "super councilmanic" body; we simply inquire whether the action of Council finds warrant in the law, bearing in mind that Council can act *if* it is empowered to do so by the Constitution, the General Assembly of the Commonwealth or the City Charter.

The present controversy must be placed in its proper posture. The right of the Council in general to enact tax measures is not at issue. The issue is whether the Council has the right to enact *new or so-called interim* tax measures and to appropriate the proceeds therefrom *after* having adopted its operating budget for the fiscal year and *after* having enacted tax measures to meet the appropriations contained in the operating budget.

We initiate our inquiry with a restatement of a concept basic and inherent in our form of government, a concept established beyond question in the law of this Commonwealth. The power of taxation, in all forms and of whatever nature, lies solely in the Gen-

eral Assembly of the Commonwealth acting under the aegis of our Constitution.[6] Absent a grant or a delegation of the power to tax from the General Assembly, no municipality, including Philadelphia, a city of the first class, has *any* power or authority to levy, assess or collect taxes. To determine whether a municipality possesses the power to tax and, if so, the extent of such power, recourse must be had to the acts of the General Assembly.

In *Fischer v. Pittsburgh*, 178 Pa. Superior Ct. 16, 112 A. 2d 814 (1955), *aff'd.*, 383 Pa. 138, 118 A. 2d 157 (1955), Judge WOODSIDE, speaking for the Superior Court, stated: "Municipal corporations can levy no taxes upon inhabitants or their property unless the power to do so is *plainly* and *unmistakably* conferred by the legislature" (178 Pa. Superior Ct. at p. 20). (Emphasis added) Chief Justice STERN, speaking for the Supreme Court in *Fischer*, stated: ". . . municipal corporations can levy no taxes unless the power be *plainly* and *unmistakably* conferred by the sovereign state, and the grant of such right must be strictly construed and not extended by implication [citing authorities]." (383 Pa. at p. 141) (Emphasis added)

Moreover, the determination of whether the General Assembly has granted to a municipality the power of taxation in a particular area is subject to a strict construction and the grant of such power may not be found by implication. See: *Fischer v. Pittsburgh*, supra; *Murray v. Philadelphia*, 364 Pa. 157, 163, 164, 71 A. 2d 280 (1950); *Breitinger v. Philadelphia*, 363 Pa. 512, 514, 515, 70 A. 2d 640 (1950); *Marson v. Phila-*

---

[6] "That the power to tax is peculiarly a power of the legislature [citing authority] has never been questioned in this country and has frequently been asserted by our courts: [citing authorities]." *Wilson v. Phila. School District*, 328 Pa. 225, 229, 195 Atl. 90 (1937).

*delphia,* 342 Pa. 369, 373-375, 21 A. 2d 228 (1941); *Wilson v. Philadelphia School District,* 328 Pa. 225, 229, 230, 195 A. 90 (1937).

As a necessary corollary to the exclusive competency of the General Assembly to authorize the imposition of taxes by a municipality, the General Assembly possesses the sole competency to determine not only the areas of permissible taxation but also *when* and *in what manner* such taxes shall be imposed. If, for instance, the General Assembly alone has the power to authorize the taxation of real estate by municipalities, it stands to reason that the General Assembly alone has the power to determine the frequency with which the power of taxation may be exercised. Were it otherwise, taxation by municipalities could well result in an intolerable situation.

Now that we have outlined the general principles which must guide our decision, we turn to the specific issue involved in this case. The City contends that, by reason of certain "unanticipated emergencies" which have occurred during its current eighteen-month fiscal year but subsequent to the passage of its budget for the fiscal year and which emergencies have forced it to exceed its present budgetary appropriation, it has the right, in order to bring its budget into balance, to enact *new* tax measures during the fiscal year. On the other hand, the taxpayer-appellees maintain that the City lacks the power and authority to enact *new* tax legislation and to appropriate the proceeds therefrom *after* its operating budget has been adopted.

We begin by looking at the case law on this question. The City cites two cases wherein this Court has upheld the adoption of interim taxing measures.[7] Both cases are inapposite. In both *Treaster* and *Dunkard,*

---

[7] *Dunkard Twp. School Tax Case,* 359 Pa. 605, 60 A. 2d 39 (1948); *Treaster v. Union Twp.,* 430 Pa. 223, 242 A. 2d 252 (1968).

the statutes in question *specifically* granted the taxing authority the right to interim taxation during the fiscal year.

The taxpayers rely, to some extent, on *Rose Twp. v. Hollobaugh*, 179 Pa. Superior Ct. 284, 116 A. 2d 323 (1955). In *Rose Twp.*, Judge WOODSIDE, speaking for the majority, pointed out that the Second Class Township Code involved in *Rose Twp.* provided for an annual budget which would show the estimated revenues and expenditures in the forthcoming fiscal year, all for the purpose of determining how much tax to levy. He then stated: "The budget required is more than a mere estimate of probable revenues and expenditures. It is a method whereby expenditures are controlled and limited during the fiscal period by designating the amount of money legally at the disposal of the supervisors and the purpose for which it may be expended. Kistler v. Carbon County, 154 Pa. Superior Ct. 299, 301, 302, 35 A. 2d 733 (1943). These budget provisions are not directory but 'in the highest degree mandatory.' Leary v. Philadelphia, 314 Pa. 458, 472, 172 A. 459 (1934).

"The Supreme Court has required such strict compliance with the provisions of this section that township supervisors have been removed from office for failure to comply with them, even when the supervisors were depending upon their solicitor to file the required reports. Crane's Appeal, 344 Pa. 624, 26 A. 2d 457 (1942), and others have been surcharged for making disbursements without previous appropriations according to the provisions of the section even though the township received a reasonable quid pro quo for the unauthorized outlays and no fraud or dishonesty on the part of the supervisors was shown. Lower Nazareth Township Supervisors' Appeal, 341 Pa. 171, 19 A. 2d 92 (1941).

"In Dunkard Township School Tax Case, 359 Pa. 605, 60 A. 2d 39 (1948) the court permitted a school district to impose a tax under Act 481 after the budget had been approved but the court placed its decision on the ground that the Act of July 5, 1947, P. L. 1266 specifically authorized a revision of the school budget for that year.

"Justice, now Chief Justice STERN, indicated that the right not only to revise the budget but also to provide for additional revenue was limited to the one fiscal year.

"Provisions concerning budgets have been in the second class township law for many years, but the budgetary requirements imposed upon the supervisors have become more strict and detailed with the passing years.

"It is vital for the good administration of municipal affairs for its officials to budget expenditures for the necessary functions and thereby determine the amount of tax necessary for the operation of the municipality for the ensuing year. It was for the purpose of protecting the public against extravagance and waste in local government that the budget provisions were made more stringent over the years both by statutes and court decisions." (pp. 291-293)

. . .

"If we were to decide that a municipality could enact new tax legislation and appropriate the proceeds therefrom after the budget was adopted, we would, to a great extent, destroy the value of the provisions relating to budgets. We think that was not the intent of the legislature in passing Act 481 and its amendments." (p. 294) The Court held in *Rose Twp.* that the municipality lacked authority to levy an interim tax measure. While we recognize that *Rose Twp.* can be distinguished from the instant case, because, admittedly, in *Rose Twp.* the tax was not levied for emergency

purposes and because the second class township therein involved did not operate under a "home rule charter," nevertheless the rationale of *Rose Twp.* is clearly applicable to the instant situation.

Since the case law is so meager on this question and because the exact issue before us is one of first impression, we must go back to the acts of the General Assembly which confer taxing powers upon the City. The specific question we must answer in this case is whether the General Assembly has conferred the power of *interim* taxation upon the City. The General Assembly could confer such power in either of two ways. First, in granting to the City the power of home rule, it could confer the power of interim taxation as one of the sovereign powers of a home rule government. Second, in granting to the City the power to levy a particular type of tax, it could grant to the City the additional power to levy that tax *during* the fiscal year.

We start with the first method by which the General Assembly might confer the power of interim taxation upon the City. By an amendment to our Constitution (adopted November 7, 1922) titled Article XV, §1, cities, after appropriate action by the General Assembly and upon approval of the electorate of such cities, were granted "the right and power to frame and adopt their own charters and to exercise the powers and authority of local self-government, subject, however, to such restrictions, limitations, and regulations, as may be imposed by the Legislature." Acting within such constitutional fiat and an act of the General Assembly (Act of April 21, 1949, P. L. 665, 53 P.S. §13101),[8] a "Philadelphia Home Rule Charter" was prepared by a distinguished Commission, submitted to

---

[8] Cf. Acts of March 4, 1862, P. L. 90, and June 25, 1919, 53 P.S. §12553.

and approved by the electorate and became the organic
law of the City subject, of course, to any legislatively
imposed restrictions as contemplated by Article XV,
§1, of our Constitution.

The Act of 1949 does not grant any specific taxing
powers to the City. Section 17 of the Act grants to
the City "all powers and authority of local self-govern-
ment" including "complete powers of legislation and
administration in relation to its municipal functions.
. . ."[9] Although §17 appears to convey broad legisla-
tive powers to the City, it does not attempt to estab-
lish the City's general taxing powers and structure.
Section 11 of the Act of 1949 states in pertinent part:
"Any new charter or amendments to the charter of a
city thus proposed, which are approved by a majority
of the qualified electors voting thereon, shall become
the organic law of the city. . . . *All existing acts* or
parts of acts and ordinances *affecting* the organization,
government and *powers of the city, not inconsistent* or
in conflict *with the organic law so adopted, shall re-
main in full force.* . . ." (Emphasis added) (Act of
April 21, 1949, P. L. 665, §11, 53 P.S. §13111) We
must look to see, therefore, whether there are any
other acts of the General Assembly which deal with
the question of taxation directly. If there are any
such acts, they are controlling on the City by virtue
of the section quoted above unless they are inconsistent
with the Philadelphia Home Rule Charter.

Article 17 of the First Class Cities Act, or the Act of
1919, deals specifically with the question of municipal
finance. If this Act is applicable to this case—a matter
upon which the court below divided—that Act pro-
vides that on or before December 15,[10] the City Council

---

[9] Act of April 21, 1949, P. L. 665, §17, 53 P.S. §13131.

[10] Most important is the thrust of the statutory intendment
that there be *one* levy of the tax rate which shall take place prior

shall, *in one ordinance,* adopt a "financial program for the ensuing year" (53 P.S. §12552), and, on or before December 15, the Council "shall levy and fix a tax rate for the ensuing year" and, upon Council's failure to do so, the "rate for the current year shall be the rate for the ensuing year." (53 P.S. §12553)[11]

The Act of 1949, supra, authorizing the Charter of Philadelphia, provides, inter alia, that: "Notwithstanding the grant of powers contained in this act, no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are—(a) Applicable to a class or classes of cities on the following subjects: . . . (8) Limiting rates and fixing subjects of taxation; (9) Providing for the assessment of real or personal property and persons for taxation purposes. . . ."[12] Neither in the title nor in any of the provisions of the Act of

---

to the fiscal year. We realize that much of the argument both below and before this Court focused on the question of whether the revenue bills enacted by the Council are void because they were not passed on or before December 15. Because of the way we have decided this case, we find it unnecessary to resolve that particular issue.

[11] The provisions of the Act of 1919, supra, if inconsistent with the provisions of the Act of June 21, 1939, P. L. 617, 53 P.S. §15723, would be suspended. The Act of 1939, supra, authorizes cities of the first class to provide for the payment of certain defined deficiencies and indebtedness in certain equal annual installments and "to levy and fix the tax rate, and to make appropriations, and prepare and formulate the financial programs of such cities of the first class upon the basis of the discharge of such deficits and indebtedness" as outlined in the statute. The provisions of this statute as to levying and fixing the tax rate in no wise altered the provisions of the Act of 1919, supra, as to the *time* for levying and fixing of the tax rate. We find nothing in the Act of 1939, supra, which is inconsistent with those provisions of the Act of 1919, supra, which provide the *time* for the levying and fixing of the tax rate.

[12] Act of April 21, 1949, P. L. 665, §18, 53 P.S. §13133.

1949, supra, is there any change pertaining to the *time* set by the Act of 1919, supra, when the tax levy shall be made and the tax rate fixed. The 1949 Act does not specifically repeal the Act of 1919, and we find nothing in the 1949 Act inconsistent with the provisions of the 1919 Act as to the time for the levying of taxes and fixing the tax rate which would, by implication, suspend the time provisions of the 1919 Act. In summary, therefore, we believe that the Act of 1919 is presently applicable, that under its provisions the tax rate for the current eighteen-month fiscal year had to be fixed by December 15, 1967,[13] and no interim adjustment of the tax rate was provided therein. Since we are forbidden to imply the grant of the power of interim taxation and since we cannot find any express provision therefor, we are of the opinion that the statutes which enable Philadelphia to levy, assess and collect taxes intend the levy and fixing of the tax rate by one and only one legislative act which must occur prior to the fiscal year.

We have examined the various statutes granting to the City its home rule powers and dictating the requirements as to the City's fiscal budget and have found no indication that the General Assembly intended to confer interim taxing power upon the City.

Even if we were to assume that the 1949 statute did grant to the City the right to choose, through the medium of its Charter, the *manner* in which it would exercise its General Assembly-granted power to tax, this assumption does not aid the City because not only does the Charter fail to provide for interim taxation but its scheme contraindicates such taxation.

---

[13] Impliedly, the City, in fixing the tax rate for the current fiscal year, took the same position because it did levy and fix such tax rate on or before December 15, 1967.

In examining the Charter provisions, we must be guided by the well-settled principle that tax statutes must be strictly construed against the taxing authority and that all reasonable doubts must be resolved in favor of the taxpayer. See: *Commonwealth v. Willson Products Co., Inc.*, 412 Pa. 78, 194 A. 2d 162 (1963); *Commonwealth v. Allied Bldg. Credits, Inc.*, 385 Pa. 370, 123 A. 2d 686 (1956).

The City, under the Charter, has "the power to enact ordinances and to make rules and regulations necessary and proper to carry into execution its powers; . . ." (§1-100), and the "legislative power of the City . . . [is] exclusively vested in and exercised by [the] Council, subject only to the provisions of this Charter." (§1-101)

Chapter 3 of the Charter, dealing with "Legislation," provides that thirty days *prior* to the end of the fiscal year it shall be Council's duty to adopt the annual operating budget ordinance for the next fiscal year (§2-300(1)), that such annual operating budget ordinance shall provide for "discharging any deficit" and shall make appropriations to Council, the Mayor and all officers, etc., of the executive and administrative branches of government and "for all other items which are to be met out of the revenue of the City," that the appropriations for the use of any departmental board or commission shall be made to the department with which it is connected (§2-300(a)), that the Mayor's estimate of receipts for the ensuing fiscal year and of surplus or deficit, if any, for the current fiscal year "may not be altered by the Council" (§2-300(3)), that the "annual operating budget ordinance may be amended after its passage to authorize the transfer of items *but the aggregate of the appropriations made by it may not be increased* and transfer of budget items may not be made during the last four months of any

fiscal year" except on the Mayor's recommendation (§2-300(6)). (Emphasis added)[14]

---

[14] The purposes of the several sections of the Charter have been spelled out in Annotations by the framers of the Charter. Section 2-300(1) requires a submission by the Mayor of "a consolidated budget of all operating expenditures" and its enactment by Council thirty days before the end of the fiscal year, thus fixing "by *one* legislative act the expenditures for each ensuing fiscal year." (Emphasis added) Section 2-300(6) is intended to serve as a check on the practice of transferring items of the budget at the end of the fiscal year. The Annotation to Subsection 6 states: "Some agencies, finding at the end of the fiscal year that they have surplus funds left under certain items, have from time to time requested and received authorization from the Council for spending those surpluses for other purposes."

Under §2-302, there is a warning that "to assure a balanced budget," Council, *when it passes the annual operating budget,* must provide such revenue as, in the Mayor's opinion, will balance the budget and that, while the particular revenue measures to be passed rest in Council's judgment, the Mayor's estimate of the revenue yield is binding upon the Council. An examination of this Section clearly reveals that the Mayor alone bears the responsibility of fixing the amount necessary to operate the City and the amount of the revenue yield; upon Council, subject to the limitations on the power to tax imposed by the several acts of the General Assembly, rests the responsibility of determining how the revenue is to be raised to meet the Mayor's estimate of the revenue yield.

Section 8-102 provides the method whereby the Mayor is enabled to avoid deficits and to check upon performance, a method which requires that from time to time, at the Mayor's request, the various officers, department heads, etc., submit to the Mayor, through the Finance Director, estimates of the amount of money required for the ensuing month, quarter or other period of the current fiscal year as the Mayor shall prescribe, and, if such estimate fails to meet the Mayor's approval, the Mayor has the authority to direct a revision, except in several instances not presently pertinent. Upon approval of any such estimate, it is unlawful for the Finance Director, absent a revision with the Mayor's approval, to approve the expenditure or the encumbrance of the appropriation or any part thereof. "An order [that the full amount of an appropriation shall not be expended] would be appropriate if it should appear that revenues will not equal expenditures."

Section 2-301 is of particular importance and reads, in pertinent part, as follows: "Section 2-301. Other Appropriations. The Council may not make any operating appropriations in addition to those included in the annual operating budget ordinance except: (a) To meet emergencies which could not be anticipated when the operating budget ordinance was passed; . . .

"Unless paid for out of current revenues, all amounts appropriated under this section must be included as liabilities of the City in the next succeeding annual operating budget ordinance and except to meet emergencies, operating expenses shall neither be appropriated nor paid out of loan funds." In commenting on this Subsection, the framers of the Charter explained its purpose as a limitation to prevent the "incurring of deficits," that it embraces emergencies which "may not have been foreseen" when the annual operating budget was enacted, that, if it be resorted to, operating expenses shall not be appropriated or paid "out of loan funds" but "be made up out of current revenues or taken care of by the next operating budget."

Assuming, arguendo, that emergencies arose which were unanticipated within the intendment of §2-301, supra, does this Section confer upon the City the right to enact *new* interim tax measures to meet and fulfill the increased need? The taxpayer-appellees ar-

---

The instant record is silent as to any compliance with the provisions of §8-102.

Section 8-107 prohibits additional compensation for extra services for noncivil service employees unless such services are *expressly* authorized by the Administrative Board (the Mayor, Finance Director and Managing Director) prior to the rendering of such services and a certification of such authorization to the Comptroller. See also: Section 4-300. The instant record shows no compliance with this Section with respect to overtime payments to the policemen, firemen or other noncivil service employees.

gue that, while §2-302 does permit the City to cope with "unanticipated emergencies" by making an emergency appropriation in addition to those included in the annual operating budget, the City has only three alternatives for finding the money to meet such additional appropriations: first, by the reduction of expenses in other areas of City government; second, by borrowing the necessary funds for the payment of which borrowing monies must be appropriated in the next fiscal year's operating budget; and, third, by paying such appropriations out of "current revenues." The taxpayer-appellees contend—and Judge SMITH of the court below agreed—that "current revenues" do not include the proceeds of taxing measures enacted during the fiscal year subsequent to the adoption of the operating budget.

The City argues that the provisions of §2-302 which authorize Council, in the event of "unanticipated emergencies," to make "operating appropriations in addition to those included in the annual operating budget ordinance," grant the power to pay for such additional appropriations by enacting new tax measures to meet the new appropriations. With this interpretation we cannot agree. The Charter clearly intended that the expenditures for each ensuing fiscal year be fixed by *one* legislative act. The entire Charter scheme envisages but one legislative act and one operating budget.

Our review of the Charter reveals no authority whatsoever to enact new or interim tax measures, and we find no evidence, either express or by implication, of any intent upon the part of the framers of the Charter to provide for interim taxation.

The City argues that, since the Acts of 1919 and 1949 do not specifically prohibit interim taxing measures, such measures must be legal, and the City fur-

ther notes that it does not seek *carte blanche* interim taxing power but merely emergency interim taxing power. While willing to concede that, under the Charter, it can make unbudgeted appropriations only for unanticipated emergencies, it takes the position that it can levy interim taxing measures to meet such emergency appropriations.

We are not convinced by the City's argument. The City admits that its power to pass interim taxing measures, if it has such power, exists only in emergency situations. Such limitation is found in the Charter which forbids the City from making unbudgeted appropriations save in an emergency situation. The vital factor is that the enabling acts of the General Assembly make no distinction between emergency and nonemergency interim taxes; in fact, these statutes do not mention interim taxation. The logical result of the City's argument is that, if there were no limitation on *appropriations* under the *Charter,* the City would have unlimited interim taxing power under the enabling statutes. If we are to limit the City's interim taxing power to emergency situations, we would, in effect, be holding that the enabling acts permit unlimited interim taxation. Since the enabling acts are completely silent on this question, we would have to draw two implications from these statutes to uphold the City's position; first, that the statutes permit interim taxing measures and, second, that the statutes limit interim taxing measures to emergency situations. The second implication is completely unwarranted by the language of the enabling statutes. Therefore, if the City has interim taxing power, it possesses such power in both emergency and nonemergency situations.

To sustain the City's position, we must accept the hypothesis that the enabling statutes grant the City unlimited interim taxing power, a result clearly in con-

flict with *Rose Twp.*, supra. Moreover, we cannot believe that the General Assembly ever intended to permit the City unlimited interim taxing power. The General County Assessment Law, infra note 15, from which the City derives its authority to levy a real estate tax, speaks of assessing this tax at an *annual* rate, a clear implication that the legislature did not intend that the City should have the authority to raise its fixed and established tax rates during the fiscal year. Moreover, the Act of 1919 (Act of June 25, 1919, P. L. 581, §3, 53 P.S. §12553) requires that local governments balance their anticipated budgets and levy and fix the tax rate prior to the beginning of the fiscal year. The emphasis on requiring a balanced budget prior to the beginning of the fiscal year apparently results from a conclusion by the legislature that it is unwise for municipalities to wreak havoc with their adopted budgets by passing unlimited interim appropriations and taxing measures.

The second method whereby the General Assembly could confer interim taxing power upon the City is by permitting the City to levy a particular tax *during* the fiscal year. We will now consider the two major statutes granting the City the power to levy particular taxes—the General County Assessment Law[15] and the so-called Sterling Act.[16] The former act empowers Philadelphia to assess and collect taxes upon real estate while the latter act empowers Philadelphia to levy, assess and collect certain additional taxes for general revenue purposes under certain restrictions.

None of the acts of the General Assembly confer, either expressly or by implication, the right of interim taxation. Article II, §201, of the General County As-

---

[15] Act of May 22, 1933, P. L. 853, §201, as amended, 72 P.S. §5020-201.

[16] Act of August 5, 1932, P. L. 45, §1, 53 P.S. §15971.

sessment Act, supra, provides, inter alia: "The following subjects and property shall, as hereinafter provided, be valued and assessed, and subject to taxation for all . . . city . . . purposes at the *annual* rate: . . ." (Emphasis added) Nothing in this statute warrants a valuation and assessment of realty other than by one act nor is there any authorization for the levy of taxes other than on an annual or fiscal basis. We cannot read into the language of this statute an implication of a grant of the power to tax real estate other than by one levy during the annual or fiscal year.

The Sterling Act says nothing about how or when the taxes authorized by that act are to be collected. Therefore, we must assume that the acts of 1919 and 1949 establishing the City's general authority to levy taxes are controlling. We have already determined that these acts do not confer interim taxing powers upon the City. Therefore, we must likewise conclude that the Sterling Act also does not confer interim taxing powers upon the City for the particular subjects covered by the act.

The City contends that a decision adverse to it would be wrong from a policy standpoint because the City would now have to borrow money which would mean additional interest costs to be paid out of next year's operating budget. This argument is only partially correct because the City has the further option of reducing and cutting expenses. While we are fully aware that many expenses of City government, such as providing adequate and effective police and fire protection, cannot and must not be reduced, there may well be areas in which municipal expenses can be reduced. We cannot fail to note some merit in the taxpayer-appellees' argument that the taxpayers have a right to know at the outset of the taxing and fiscal year the extent of their responsibility for taxation and

to plan therefor; certainly, in the absence of some statutory limitation on interim taxation, municipal government could run rampant. However, the problem of the grant of the right to interim taxation lies with the legislature and not with the courts.

We are convinced that the Charter could not and does not grant Council the power of interim taxation. We are further convinced that the acts of the General Assembly do not, either expressly or even by implication, grant the power of interim taxation but, on the contrary, contraindicate the grant of such power. Absent such a grant, Council lacks any authority to tax on an interim basis and the taxing measures it enacted upon such basis must fall.

If it is desirable that the City or any other municipality be permitted to enact interim taxation, such a problem is for the legislative and not the judicial branch of government.

## The Appropriation Transfer Bills

In addition to passing six tax measures which would raise an estimated $13,750,000 for the City, the Council also began consideration of a series of appropriation bills which would transfer most of the $24 million surplus[17] to various department heads and the

---

[17] In the City's brief in *Phillips v. Tate*, 431 Pa. 124, 244 A. 2d 774 (1968, argued November 14, 1967), it was stated as to this surplus: "This reserve for working capital is made necessary by reason of the fact that approximately two-thirds of the City's revenues are received during the first half of the calendar year and only approximately one-third is received during the last half of the calendar year. Without such a reserve carried over from the prior fiscal year there would be a cash deficiency during the first half of the succeeding fiscal year, constituting the last half of the calendar year. In order to avoid the issuance of tax anticipation warrants or other temporary borrowing it is necessary to have such a reserve."

$13,750,000 to be raised for the new salary increases to the Finance Director, principally to pay for salary and wage increases. The court below enjoined the Council from enacting any of the transfer bills except Bill No. 866 which would transfer the $13,750,000 to the Finance Director.

Under §2-300(6) of the Home Rule Charter, Council is permitted to transfer items within the budget as long as it does not increase the total appropriations allotted in the budget. We will assume, arguendo, that if the City's fiscal needs did not exceed the amount of the working capital surplus, the Council could transfer the surplus to the various department heads. Unfortunately, however, the City's averred current needs total approximately $38,158,000, or about $14 million more than the amount of the surplus. The City would like to transfer the bulk of the surplus to the department heads under the authority of §2-300(6), thus depleting the surplus. The City would then like to appropriate the additional $13,750,000, allegedly still needed for the salary and wage increases, by invoking the provisions of §2-301(a): "The Council may not make any operating appropriations in addition to those included in the annual operating budget ordinance except: (a) To meet emergencies which could not be anticipated when the operating budget ordinance was passed; . . ." Following a hearing held after the lower court's initial unanimous decision enjoining the enactment of the transfer bills, the Council specifically found that the expenses for the pay increases and for increased court costs were unanticipated emergency expenses. It did not find, however, that the expenses incurred by the department heads in excess of their budgets were necessarily unanticipated emergencies.[18]

---

[18] Part of the Council's resolution states:

"Whereas, The Council has previously recognized the financial emergency confronting the School District of Philadelphia and has

All three judges below questioned the order in which the Council should enact the appropriation bills. The judges took the position that, if the Council is aware that it has an alleged emergency expense of $13,750,000 and that it has a surplus of $24 million which could be used to meet this expense, the Council cannot deliberately dissipate the surplus with nonemergency transfers and then claim it faces a deficit which will require an emergency appropriation. Judge SPAETH likened this logic to that of the boy who shot his parents and then asked for sympathy as an orphan. Accepting the City's finding that these two items—pay increases and increased court costs—constitute unanticipated emergencies, we hold that the money to meet these expenses is available in the surplus and should come out of the surplus.

Judge SPAETH believed that not all of the $24 million surplus is available to meet these expenses, pointing out that the Finance Director had made informal commitments to various department heads that they would be reimbursed from the surplus for sums spent

authorized the School District to impose taxes to meet its financial emergency; and

"WHEREAS, The Council has also recognized the unanticipated emergencies that have confronted and are continuing to confront the City of Philadelphia, including the unanticipated emergencies within Section 2-301(a) of the Home Rule Charter set forth in appropriation Bill No. 866 which is recommended to this Council for passage this day pertaining to wage increases for municipal employees and additional funds needed to operate the newly consolidated Courts in Philadelphia; . . .

. . .

"AND BE IT FURTHER RESOLVED, That the appropriations recommended to the Council by Bills Nos. 854 through 865, inclusive, Bill No. 867 and Bill No. 868 are proper and necessary, provide for the payment of expenses which were unanticipated and could not reasonably be anticipated, and in very large measure were of an emergency nature, and are properly within the budget provisions of the Home Rule Charter authorizing transfers in appropriations."

in excess of their budgets. Judge SPAETH would have remanded the case to Council for a determination of how much of the surplus had been so committed and would have then held that the amount committed was no longer available to pay for the emergency expenses. However, the Charter states that only the Council can make budgetary transfers and, at least impliedly, informal commitments by the Finance Director are not legally binding under the Charter. In the face of an alleged emergency situation, the Council must postpone consideration of informal promises until the emergency has been resolved.

Therefore, we affirm the court's order below enjoining the enactment of all the transfer bills except Bill No. 866. We do not mean to imply that Council cannot now enact some of the bills so long as a deficit is not created. In short, we say nothing as to how Council should meet the informal commitments made to the department heads other than to say, of course, that Council cannot meet the obligations by passing interim taxing measures.

### Effect of Phillips v. Tate

The City has strenuously argued before this Court that the present case is merely a sequel to *Phillips v. Tate*, 431 Pa. 124, 244 A. 2d 774 (1968), in which, it suggests, we impliedly gave approval to the City's present actions. We cannot accept this broad reading of *Phillips*.[19] In *Phillips*, we were interpreting §8-100 of the Home Rule Charter which reads, "For the present, the City's fiscal year shall be the calendar year but the Council may by ordinance adopt a different fiscal year." We held in *Phillips* that the City could adopt

---

[19] The writer of this opinion joined with the majority in the 4-3 decision in *Phillips*.

an eighteen-month fiscal budget in order to convert from a calendar fiscal year to a fiscal year beginning on July 1. We realized that the City would be unable to comply with certain technical requirements of the Charter because the Charter speaks in terms of an *annual* budget, whereas in order to change over from a calendar year fiscal budget—which Council had the authority to do under the Charter—the Council would have to adopt either a six or eighteen-month budget. That was the holding in *Phillips.* We certainly did not give the City license to revamp the tax structure of the City in the middle of the fiscal year. In its brief, the City argues that the Mayor and Council "were justified in assuming that the courts would not insist upon complete technical compliance with the provisions of the Philadelphia Home Rule Charter in this unique situation and that the courts would respect the sound discretion of City Council in meeting the practical problems inherent in the change of the fiscal year." If this statement means that we would not insist on strict compliance with the requirements of the Charter that the City operate under an annual budget, we would agree that the statement is accurate. If, however, this statement means that in allowing the City to adopt a *one-shot* eighteen-month budget, we impliedly gave the City the authority to revise taxes after two-thirds of the fiscal year had expired, we cannot agree. A $13,750,000 tax increase during the fiscal year is more than a mere technical noncompliance with the provisions of the Charter.

The City next argues that the Charter assumes that Council has the right to review the budget every twelve months. What the Charter says is that the Council will review the budget at the end of every fiscal year, which will be June of 1969. Having adopted an eighteen-month fiscal budget, the City must now wait

until the expiration of the eighteen-month period before raising taxes or imposing new ones. In effect, the City is arguing that it is just not possible to anticipate the needs of the City over an eighteen-month period. But, if the Council were so concerned about its limited forecasting abilities, it had the option of adopting a *six*-month fiscal budget. When the School Board of Philadelphia changed over from a calendar fiscal year in 1966, it adopted just this procedure. The City cannot be heard to say now that it made a mistake when it adopted the eighteen-month budget and that we should rescue it by somehow finding that it has the power of interim taxation when the legislature has not seen fit to confer such power upon the City.

Finally, the City argues that we impliedly gave our consent to two tax periods during the eighteen-month budget when we said in *Phillips*, "Furthermore, we recognize, as do all the parties involved, that the proposed eighteen-month budget encompasses two substantial revenue periods while at the same time includes only one substantial expenditure period." (431 Pa. at 127) The City has misconstrued the import of this sentence. In this statement, Justice COHEN, speaking for the majority, was attempting to answer the criticism of the three dissenters that the City was violating the requirements of a balanced budget because at the end of the first twelve months of the fiscal year, the City would face a $25 million deficit. We interpret Justice COHEN's statement to mean that the majority was aware of this fact and also of the fact that the $24.4 million surplus available at the end of the eighteen-month budget was perhaps smaller than it should have been in light of the fact that the eighteen-month budget encompassed the first halves of two years when two-thirds of the City's annual revenues are collected. Nevertheless, the majority felt that the City was not

violating the requirement of a balanced budget because, at the end of the eighteen-month budget, there would be no deficit. We do not read Justice COHEN'S statement to mean that the City would have *two* shots at the taxing structure during the eighteen-month period.

### Increases in the Parking Fines

Two of the measures—Bills Nos. 822 and 823—increased the fines for parking violations and for parking meter violations from $3.00 to $6.00. The lower court dissolved its injunction as to these two bills, holding that the bills were properly enacted under Council's police power to regulate parking in the streets.

The City, unquestionably, under its police power has the right to regulate parking in its streets by the imposition of parking fines. Section 1-100 of the Charter empowers the City to enact ordinances, rules and regulations and to enforce them by the imposition of fines not to exceed $300.00. This constitutes the only Charter-imposed restriction on the power of the City to impose fines.

The taxpayer-appellees have cited a number of cases wherein this Court has held that municipalities, under the guise of police measures, cannot impose revenue taxes.[20] On the state of the instant record, it is quite

---

[20] In *Kittanning Borough v. American Natural Gas Co.*, 239 Pa. 210, 211, 86 A. 717 (1913), the Court stated: "If anything can be considered as settled under the decisions of our Pennsylvania courts it is that municipalities under the guise of a police regulation cannot impose a revenue tax. This principle has been so uniformly and repeatedly asserted that it is unnecessary to cite authorities in support of it." See also, *Olan Mills, Inc. v. Sharon*, 371 Pa. 609, 614, 92 A. 2d 222 (1952) ; *Flynn v. Horst*, 356 Pa. 20, 28, 51 A. 2d 54 (1947) ; *William Laubach & Sons v. Easton*, 347 Pa. 542, 548, 32 A. 2d 881 (1943).

apparent that Bills Nos. 822 and 823 were enacted primarily as revenue measures.[21] Even though it is apparent that these two bills were enacted as revenue-raising measures, we must disagree with taxpayer-appellees that, *for that reason*, these Bills must be invalidated. The cases upon which taxpayer-appellees rely all dealt with license fees and not fines; therein lies an important distinction.

A license fee is a sum assessed for the granting of a privilege.[22] In most instances, where a license is granted the City invariably incurs expense such as the cost of registration and inspection; it is only proper that one who seeks and receives a license should bear this expense. To defray the cost of a license a fee is

---

[21] The following testimony by the Finance Director conclusively demonstrates to us that the parking fines were increased primarily to raise additional revenues for the City: "In view of the fact that the recent wage negotiations conducted with the City employees has generated a requirement for an additional $13 million, it is necessary that additional moneys be provided for the next six months to operate the City of Philadelphia. These *tax* ordinances that have been introduced will provide—and I will go down each one as it affects the City—[The Finance Director then discussed the wage, net profits and mercantile license taxes]. Parking fine increase in rate from $3 to $6 effective January 1, 1969, *will generate $1.3 million.*" (Emphasis added) Testimony of Edward J. Martin before the City Council Committee of Finance, December 17, 1968.

[22] In *National Biscuit Co. v. City of Philadelphia*, 374 Pa. 604, 615-616, 98 A. 2d 182 (1953), Chief Justice STERN said: "The distinguishing features of a license fee are (1) that it is applicable only to a type of business or occupation which is subject to supervision and regulation by the licensing authority under its police power; (2) that such supervision and regulation are in fact conducted by the licensing authority; (3) that the payment of the fee is a condition upon which the licensee is permitted to transact his business or pursue his occupation; and (4) that the legislative purpose in exacting the charge is to reimburse the licensing authority for the expense of the supervision and regulation conducted by it."

charged to the licensee; however, this fee must be commensurate with the expense incurred by the City in connection with the issuance and supervision of the license or privilege. See: *American Baseball Club of Philadelphia v. Philadelphia, Moore, Mayor*, 312 Pa. 311, 316, 167 A. 891 (1933).

A fine or penalty differs substantially from a license fee. It is self-evident that a City in enforcing and collecting a fine or penalty incurs expense, an expense the fine is intended to recover. However, the primary purpose of a fine or a penalty is twofold: to punish violators and to deter future or continued violations. Since it serves not only as a punishment but also as a deterrent, the amount of the fine can be raised to whatever sum is necessary to discourage future or continued violations, subject, of course, to any restriction imposed on the amount of the fine by the enabling statute or the Constitution. Thus, if the City finds that it costs $1.00 to enforce each parking violation, it is not restricted to imposing a $1.00 parking fine, if the payment of such an amount will not discourage illegal parking.

There is another significant distinction between a license fee and a fine. A person who wants to possess and enjoy a privilege in the form of a license must pay the corresponding license fee and it is inequitable for a municipality to raise revenues for general purposes by imposing a larger license fee on a certain class of people who must pay the fee to secure the privilege or license. On the other hand, there is no requirement that one place himself in a position which subjects him to a fine; he may merely choose not to engage in the prohibited activity and, if he does not do the prohibited act, he need not pay a fine.

Under the Charter, there is a $300.00 ceiling on fines, the only restriction imposed on the City's power

to impose fines. However, Article I, §13, of our Constitution provides that *excessive* fines shall not be imposed. If the City were to increase parking fines to $300.00 and a court of law found this sum to be excessive under constitutional standards, the fines would be stricken. The taxpayer-appellees do not contend, nor do we find, that a $6.00 fine for a parking violation is excessive.

If the increase in parking fines does not offend the $300.00 restriction under the Charter or the reasonableness requirement of our Constitution, the fact that the City increased the parking fines, in order to raise its revenues, is irrelevant. Since neither Bill 822 nor 823 violates either the Charter or the Constitution, we affirm the holding of the court below as to these Bills.

### The School District Taxes

The final two tax measures enacted by City Council—Bills Nos. 828 and 829—were designed to raise an estimated $28,750,000 for the School District of Philadelphia. The court below unanimously agreed to dissolve its injunction as to these two bills, finding that the two bills were not interim tax measures.

The history behind these two measures is important. Since July 1, 1966, the School District has operated on a fiscal year ending on June 30. In preparing its budget for the 1968-69 fiscal year, the School District submitted to the Mayor and City Council on April 3, 1968, a lump sum statement of anticipated receipts and expenditures as required by §12-303(b) of the Education Supplement to the Home Rule Charter [Supplement].[23]

---

[23] "At least sixty (60) days prior to adoption of the annual operating budget, the Board shall adopt and submit to the Mayor and Council a lump sum statement of anticipated receipts and expenditures for the next fiscal year and a request for authority to levy taxes to balance its budget for the year. . . ."

The School District reported that anticipated receipts totalled $208.1 million as against anticipated expenditures of $242 million. In order to balance its budget, the School District asked City Council for permission to levy taxes in the sum of $33.9 million.[24] The Council failed to act on this request before May 31, 1968, the date on which the School District was required to submit its budget for the ensuing fiscal year.[25] The budget submitted by the School District on that date was balanced at $213,215,000. At the same time the School Board announced that the schools could not operate beyond March 31, 1969, without an additional $28,845,926.

In August, 1968, ordinances were introduced in City Council which would have given the School District the authority to impose taxes to raise the necessary funds. On December 5, 1968, Council enacted two of the ordinances, namely, the General Business Tax and the Unearned Income Tax and, finally, on December 27, Council enacted Bills Nos. 828 (Stock Transfer Tax) and 829 (increase in Real Estate Tax), which taxes are the subject of the present controversy.

Taxpayer-appellees argue that Bills Nos. 828 and 829 are interim taxes and, therefore, are outside the taxing authority of the Council or the School District. The School District takes the position that the tax

---

[24] Authority to enact such taxing measures is found in the Act of August 9, 1963, P. L. 640, §1, as amended, 53 P.S. §16101. See, note 27 *infra*.

[25] "The Board of Education shall, at least thirty (30) days before the end of the fiscal year, adopt by majority vote of all its members an operating budget setting forth in lump sum amounts the proposed expenditures of the Board during the next fiscal year . . . and the estimated receipts of the Board during the next fiscal year, including approximate estimates of proposed revenues and all other receipts. *The total amount of proposed expenditures shall not exceed the amount of funds available for School District purposes.*" (Supplement, Section 12-303(a)) (Emphasis added)

measures were not interim taxes but were anticipated before the start of the fiscal year and that, therefore, it had the authority under the Supplement to enact such taxes.[26]

Bills Nos. 828 and 829 were enacted under the authority of the Act of August 9, 1963, P. L. 640, §1, as amended, 53 P.S. §16101.[27] Section two of the Act reads as follows: ". . . Such taxes [enacted by the Council for the needs of the School District] shall be levied, assessed and collected in accordance with all provisions, restrictions, limitations, rights of notice and appeal as are *applicable to like taxes imposed for city purposes.*" (Emphasis added) In addition, §12-502(c) of the Supplement states: "The following Sections of the Philadelphia Home Rule Charter shall not apply to the Board of Education or to The School District of Philadelphia: [Listing sections which are not relevant to this case]. *In all other respects the Philadelphia Home Rule Charter* so far as pertinent *shall apply to the Board and to the District.*" (Emphasis added)

We have already held that the Charter does not confer the right of interim taxation upon the Council and, therefore, unless the controlling sections of the Supplement differ in this regard from the corresponding sections in the Charter, we are constrained to hold under

[26] The School District does not argue that the revenues are needed to meet unanticipated emergencies. In light of the fact that the School District anticipated these needs in its report to Council on April 3, 1968, it could hardly make such an argument.

[27] "(a) The council of any city of the first class, coterminous with a school district of the first class may, by ordinance, authorize the board of public education of such school district to impose taxes for the purposes of such school district on any persons, transactions, occupations, privileges, subjects, and real and personal property which may now or hereafter be taxable by such city for general revenue purposes. . . ."

the authority of the Act of 1963 and of §12-502(c) of the Supplement that the School District also lacks the authority to levy interim taxes.

The dispositive Section of the Supplement is 12-303(e): "The Board shall have the power to make additional appropriations or increase existing appropriations *to meet emergencies* which could not be anticipated when the budget was adopted, the funds therefor to be provided from unexpended balances in existing appropriations, from unappropriated revenues, if any, or from temporary loans. Under no other circumstances may the Board increase the aggregate total of budget appropriations *unless unappropriated revenues become available* in sufficient amount to maintain the budget in balance, in which event the Board may make additional or increased appropriations." (Emphasis added) The School District concedes that the present situation does not entail an unanticipated emergency and, therefore, the second, rather than the first, sentence is crucial to the question of interim taxation. The School District argues, in effect, that §§1-100 and 1-101 of the Charter give the City authority to pass interim tax measures and that the reference to "unappropriated revenues" in the second sentence quoted above indicates that the framers of the Supplement were aware that the Council could enact interim tax measures, thus providing funds which were not provided for in the annual operating budget.

We have already rejected the first half of the School District's argument when we held above that the Charter does not confer interim taxing power upon the City. Therefore, the only argument that the School Board can now make is that the last sentence of §12-303(e) somehow implies the grant of interim taxing power to the School District.

If the School District is correct in its argument that the second sentence confers interim taxing power

upon the School District, then what is the import of the first sentence? If the second sentence confers unlimited interim taxing power upon the School District, then it was not necessary to include the first sentence to tell the School District how to deal with unanticipated emergencies. If the School District is empowered to levy interim taxes at any time, which means, in effect, that they can make "unappropriated revenues" available at any time, which further means they can increase the general appropriations at will under the authority of the *second* sentence, then why does the *first* sentence of the subsection limit additional appropriations to emergency situations? A logical construction of this section leads us to conclude that the reference to "unappropriated revenues" contained in the second sentence does not confer interim taxing power upon the School District.

Section 12-303(e) of the Supplement closely parallels §2-301 of the Charter except that the Charter provision makes no reference to "unappropriated revenues." What, then, do these words mean as they are used in the Supplement? The School District receives money from the State and Federal Governments and, at times, this money is not received until after the current fiscal budget has been adopted. We read this sentence to mean that, if the School District receives such money, it may appropriate it during the current fiscal year even though such funds were not included in the total appropriations in the operating budget. Under no reasonable construction of these words can we read this sentence to mean that the School District has the power of interim taxation.

It is with extreme reluctance that we reach this result. We are well aware that the School District now faces the threat of an early cessation of the school year, a possibility calamitous to contemplate. This possibility is certainly not the fault of the School Dis-

trict. Nevertheless, our province is to interpret the language of the Charter and the Educational Supplement, which, in our view, require that Council enact the tax measures necessary to balance the School Board's budget *before* the date that the budget becomes effective.

We are fully cognizant of the impact of our conclusion on both the City and the School District. If the right to levy taxes on an interim basis is to be granted, it must be by the legislature which has not done so and not by the judiciary which, under the language of the present statutory law, cannot find the existence of the right to interim taxation. Relief to the School District is imperative and vital and should be *promptly* and adequately given by the legislature.

Decree as to Bills Nos. 822-827 and 854-867 affirmed.

Decree as to Bills Nos. 828 and 829 reversed.

Each party to pay own costs.

Bills Nos. 822 and 823: Mr. Chief Justice BELL files a dissenting opinion.

Bills Nos. 824-827: Mr. Chief Justice BELL files a concurring opinion. Mr. Justice COHEN and Mr. Justice EAGEN file separate dissenting opinions.

Bill No. 826: Mr. Justice ROBERTS files a dissenting opinion.

Bills Nos. 828 and 829: Mr. Chief Justice BELL files a concurring opinion. Mr. Justice COHEN, Mr. Justice EAGEN and Mr. Justice ROBERTS file separate dissenting opinions.

Bills Nos. 854-865 and 867: Mr. Justice COHEN and Mr. Justice EAGEN file separate dissenting opinions.

---

OPINION BY MR. CHIEF JUSTICE BELL CONCURRING IN PART AND DISSENTING IN PART:

I believe that the majority Opinion is mistaken about the law and has unduly restricted and limited

the powers of City Council. An Amendment to the Constitution of Pennsylvania titled Article XV, Section 1, which was adopted by the people on November 7, 1922, gave to cities of the first class, after appropriate action by the General Assembly and upon approval of the electorate of such cities, "the right and power to frame and adopt their own charters *and to exercise the powers and authority of local self-government,*\* subject, however, to such restrictions, limitations and regulations as may be imposed by the Legislature." Pursuant to this Amendment and the enabling Act of April 21, 1949, P. L. 665, the people of Philadelphia on April 17, 1951, adopted the Philadelphia Home Rule Charter, which became the organic law of the City, subject to certain restrictions and exclusions not here relevant. Section 17 of the Act of 1949 granted to the City "Subject to the limitations hereinafter prescribed, . . . *all powers and authority of local self-government* [including] complete powers of legislation and administration in relation to its municipal functions. . . ." Certainly this gave the City of Philadelphia (subject to prescribed limitations) powers of or relating to taxation, which next to the police power is the most important and the most necessary power of a home rule charter.

For many years, Philadelphians fought for Home Rule, and it is impossible for me to believe that in their 177-page Home Rule Charter they did not include and possess at least a limited power to enact and impose taxes to meet emergencies which could not have been anticipated.

The City Charter, in Section 11-103, provides, quoting from prior legislative enactment: "Section 39 . . .; and the said city councils shall fix the rate and levy

---

\* Italics throughout, ours.

all the taxes, now authorized by law, within the limits of said city and county, except the State tax. . . ."

Moreover, Section 2-301 of the Philadelphia Home Rule Charter provides: "Section 2-301. Other Appropriations. The Council may not make any operating appropriations *in addition to those included in the annual* operating budget ordinance *except*: (a) *To meet emergencies which could not be anticipated* when the operating budget ordinance was passed."

The right and power given to Council to make operating appropriations (in addition to those included in the annual operating budget ordinance) *in order to meet unanticipated emergencies* necessarily and undoubtedly include, in my judgment, *the inherent and essential power to impose interim taxes—not unlimited interim taxes,* not interim taxes for any and every purpose, but interim taxes solely to meet unanticipated emergencies.

The measures increasing the fines for parking violations and parking meter violations were by the testimony of the City's witness (the Director of Finance) admittedly enacted as revenue measures, and not under the police power. It is well settled law that municipalities cannot impose a revenue tax under the guise of a police regulation. *Kittanning Boro. v. American Nat. Gas Co.,* 239 Pa. 210, 211, 86 Atl. 717; *Olan Mills, Inc. v. Sharon,* 371 Pa. 609, 614, 92 A. 2d 222. These taxes cannot be justified as an "unanticipated emergency" since it is clear that they are interim taxes which were enacted to produce revenue to meet a fiscal deficit which the City itself created. Moreover, they fly in the face of the majority's Opinion which holds that in all other respects interim taxes are prohibited.

The City has failed in the present case to prove that the presently challenged taxes were necessitated by unforeseen and unforeseeable, i.e., *unanticipated*

*emergencies.* Fortunately, however, the money necessary to increase the pay of the police and firemen, as well as the money for school needs, can be raised or provided in lawful ways.

For the aforesaid reasons, I concur in the results reached by the majority Opinion except with respect to the parking and parking meter violations.

OPINION BY MR. JUSTICE ROBERTS CONCURRING IN PART AND DISSENTING IN PART:

I fully concur in the Court's determination that City Council is totally and completely without power to enact *any* interim taxes for City purposes under any circumstances. The imposition by City Council of any such city tax for use during its current budget period is specifically and unequivocally prohibited by the Home Rule Charter.[1] I also concur with the Court's disposition of the appropriations transfer ordinances. However, I dissent from the majority's decision that Bills Nos. 828 and 829, designed to raise funds for the School District's budget, are invalid.

## I

At the outset it is not inappropriate for this writer—the author of the dissenting opinion in *Phillips v. Tate*, 431 Pa. 124, 128, 244 A. 2d 774, 776 (1968) (joined in by Mr. Chief Justice BELL and Mr. Justice O'BRIEN)—to observe that this second round of the City Administration's budget-tax maneuvering does not come as an unanticipated controversy. Nor am I at all surprised by the City's present position that since the majority of this Court in *Phillips* judicially ap-

---

[1] The relevant parts of the Charter and the reasons why they bar interim taxation are more than adequately set out in Justice JONES' opinion.

proved the City's deficit-surplus-budget device by gloss-
ing over the annual balanced budget mandate provi-
sions of the Home Rule Charter, we should now go
the whole way—undeterred by Charter or other legal
"technicalities"—and hold permissible the imposition
of the present interim City taxes.

In the Fall of 1967 the City Administration pre-
pared a twelve month's budget for 1968 which called
for $24,000,000 more in appropriations than in re-
ceipts. Faced with this unbalanced deficit budget and
the necessity for either reducing expenditures or in-
creasing taxes, the City Administration chose to ignore
the existence of a $24,000,000 deficit and proceeded to
create in its stead the appearance of a $24,000,000 sur-
plus by the simple but entirely unsound expedient of
changing its annual budget to an eighteen month fiscal
budget. See *Phillips v. Tate*, dissenting opinion. What
the City did in effect was to join a twelve month un-
balanced deficit budget with an additional six month
surplus budget and thereby create an eighteen month
budget showing a $24,000,000 surplus. In reality the
City joined together two unbalanced budgets (each
bad, because one is for a deficit and the other for a
surplus). It is indeed a fundamental and well-estab-
lished principle of local governmental tax and budget-
ing practice that precludes the taxing and budgeting
authorities from budgeting for a deficit or for a sur-
plus. In the former the City is proposing to spend
more than its receipts and in the latter it is taxing
more than is required to balance its expenditures. Ei-
ther a deficit budget or a surplus budget is obviously
an unbalanced budget. Each is equally contrary to
sound and acceptable governmental administration. In
1967 the City by joining together two unbalanced budg-
ets paved the way for its present fiscal predicament.

I am delighted that this Court has *now* emphatically
rejected the City's appeal for further approval to con-

duct its budgeting and taxing responsibilities in derogation of the Charter. The Court's decision today restores meaning and vitality to the fiscal provisions of the Charter and goes a long way toward insuring compliance with the budgeting and taxing provisions of the Charter and maintaining the integrity of the Charter.

What was really involved in both rounds of this budgeting-tax controversy was (1) in the first round (*Phillips*) the City Administration sought to avoid the consequences of an unbalanced deficit budget and the necessity of a tax increase in the Fall of 1967 and (2) in the present round the City sought to make its diagnosis (a $38,000,000 deficit for City purposes—the exhaustion of the $24,000,000 surplus plus the 13.8 million dollars in new taxes), prescribe the medicine and divide the dosage of increased taxes to the taxpayer by a substantial increase of taxes in January 1969 and another such increase in taxes in July 1969.

Unfortunately, the total number of tax dollars Philadelphia taxpayers will be required to pay is precisely the total of all the budget appropriations. The only way the taxpayer pays less taxes is if there is a reduction in expenditures; he pays no less because of budget changes as in *Phillips* or because of a two-step January and July tax increase as in the present case. All that that technique achieves is to permit the City Administration to decide the *amount* or portion of the dosage of increased taxes and the *time* it deems it most advantageous to administer it to the taxpayers with a minimum of adverse damage to its image.

## II

Turning to my differences with the majority opinion, I believe that the court below correctly concluded that Bills Nos. 828 and 829, which establish taxes for

School District purposes, were *not* interim taxes and thus were not within the Charter prohibition that bars the City from at this time passing taxes for its own purposes. It is absolutely clear that the School District fully complied with the requirements of the Charter by submitting to the Mayor and Council in April a lump sum statement of anticipated receipts, and expenditures for its ensuing fiscal year (July 1, 1968 to June 30, 1969), together with a request for authority to levy taxes. Since the School District was on an independent budget schedule[2] from the City (and its departments) these taxes *would have been perfectly proper* and within the Charter *at the time when they were requested* by the School District. Council, for whatever reason, chose to do nothing about this until December, when it also attempted to pass taxes for current City purposes. But while the city taxes were unquestionably interim taxes, the School District taxes were nothing more than the taxes which the School Board properly requested in the Spring. The school taxes are in no way "interim"—they are merely *late*.[3] They are, as the School District points out, measures that are separate and distinct from the tax ordinances which aim at raising money for City purposes.

---

[2] Under *Phillips v. Tate*, the City is on an 18 month budget commencing on January 1, 1968 and terminating on June 30, 1969. The City's announced aim in having an 18 month budget was to convert to a (presumably 12 month) July 1st fiscal year. The School District however has been and still is on a July 1 fiscal year. Thus the School District's new budget and request for additional taxes came at the *end* of its usual 12 month budgetary period and at the proper time for the preparation of the budget for the new period.

[3] As to the real estate taxes, since these are levied on a calendar year and do not become effective until January 1st, the delay by Council will not adversely affect the interests of the School District or the taxpayers.

Perhaps the City thought that it could gain sympathy by creating the appearance that the school taxes were inextricably tied to the city-deficit tax package. This of course is not the case, but by the same token, neither is it proper in effect to penalize the School District, which has at all times complied with the Charter (by timely submitting its budget to City Council, from which it needed authority to balance its budget for a full school year), because the City has painted itself into a corner.

As to Bill No. 826, which "balances" the real estate tax increase in Bill No. 829, by decreasing the rate of the real estate tax for City use, I believe that the court below and the majority opinion have incorrectly invalidated the measure. Bill No. 826 provides for a tax *decrease*. Thus this is not a measure of interim taxation, since it really is nontaxation, and I believe that viewed in this light, it is permissible under the Charter at any time.

In summary then, I would:

Affirm the court below as to its holdings concerning Bills Nos. 822, 823, 824, 825, 827, 828 and 829.

Reverse the court below as to Bill No. 826.

I therefore would strike down all the measures passed *except*: the parking fines (Bills Nos. 822-23); the School District taxes (Bills Nos. 828-29);[4] and the decrease in the real estate tax for City use (Bill No. 826).

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

Were the action taken by this Court today the act of a nonjudicial branch of our government, it would

---

[4] On February 4, 1969, a three judge Philadelphia Common Pleas Court unanimously struck down Bill No. 828 (the stock transfer tax) as excessively vague. That issue is not before us in this case, and nothing in this opinion is meant to reflect any view as to this issue.

be termed irresponsible. That it is taken by the majority of this Court does not make it any less so. It has consistently been urged by students of government that local services should be furnished on a "pay-as-you-go" basis. "Future generations should not be mortgaged" to benefit the present. The Home Rule Charter adopts this principle by requiring that revenue measures should be provided which will furnish income sufficient to equal projected appropriations. Thus, I agree with the positions taken by the Greater Philadelphia Movement and the Greater Philadelphia Chamber of Commerce in their briefs that no section of the Charter countermands the proposed tax ordinances. The majority also does not find a provision which places a prohibition on interim taxes. However, the majority requires 38 pages to rationalize such a prohibition into existence. On the contrary, I would find that the "unanticipated emergency" exception and the further reference that payments be made from "current revenues" in the Charter are consistent with the principle of "pay-as-you-go", and hence permit the tax ordinances.

The expenditures here involved are conceded to be necessary for School Board essentials, policemen's and firemen's salaries and expenditures required by the new Constitution. At oral argument, appellees suggested that these items could be paid for by borrowing. This is contrary to good government, good administration and "pay-as-you-go." It is undisputed that borrowing now can result only in *higher taxes* in the future.

I must further point out the inconsistency of the majority's opinion and its final exhortation to ask the legislature for permission to pass interim taxes. The majority has vitiated the taxes on the basis of provisions of the Home Rule Charter. The 1949 legislative enabling act granted "all powers and authority of lo-

cal self-government" to cities taking advantage of the Act. Philadelphia by its Charter took advantage of the Act. The majority now holds that the Home Rule Charter does not permit interim taxation. Thus, it is the Charter that requires amending. Act of 1949, P. L. 665, 53 P.S. §13101.

Innumerable objections and criticisms can be leveled both to the reasoning and the determination of the majority, but all of these are minuscule when compared with the unjustifiable harm inflicted on the Philadelphia school system and the unwarranted restrictions imposed on the Philadelphia city government.

I dissent.

---

DISSENTING OPINION BY MR. JUSTICE EAGEN:

I dissent from the majority opinion which adopts an unwarrantedly narrow and restrictive construction of the City's powers of taxation, and needlessly abandons the City and its schools in a desolate position, with only the hope that the legislature will come to the rescue.

The core principle behind the majority's disposition, namely, that a grant of the power of interim taxation has not been made unless by explication, is at loggerheads with the broad and pervasive grant of self-governing powers given to the City by the Home Rule Charter, and the Home Rule Enabling Act of 1949.

Those laws place plenary legislative powers in the City with respect to its municipal affairs, and bestow to the City, by logical implication, the power of interim taxation. Thus I consider this problem with the preconception that unless somewhere the power of interim taxation is taken from the City, it exists; the majority considers the problem with the preconception that the power of interim taxation does not belong to the City, unless somewhere, it is explicitly given to it.

The majority finds that the First Class Cities Act (Act of 1919) applies to this problem by force of a saving provision in the 1949 Charter Enabling Act, and precludes the existence of interim taxing powers in the City Council. I disagree. The 1949 Enabling Act bound the City by Acts of the General Assembly which *limited rates* of taxation. The 1919 Act was not a substantive restraint upon the City's power of taxation; it merely prescribed a budgetary scheme, and required that Council *adopt a budget* by a specified time. Nothing in the Act leads me to conclude that it was anything more than procedural. Since the Home Rule Charter provides its own budgetary scheme and procedure, the 1919 Act has no present applicability.

Section 2-301 of the Home Rule Charter enumerates four situations when the Council can make post-budget appropriations. One such situation is "to meet emergencies which could not be anticipated when the operating budget ordinance was passed." The section provides further that such appropriations can be paid for out of "current revenues" among other things. Such authorization contemplates the power of interim taxation, which, as I have indicated, belongs to the City by virtue of the pervasive Home Rule Charter, and the Home Rule Enabling Act of 1949. And this is so even if the Charter's budgetary scheme has the general effect of curbing the *exercise* of the interim taxing power in other respects.

The question next arises whether, and to what extent, an emergency exists so as to justify the use of the interim taxing power. On that score, I agree fully with Judge SPAETH's opinion in the lower court. It is harsh and unrealistic to say that no emergency exists because the City has a working surplus of some $24,000,000 from which to defray its $13,750,000 unanticipated emergency. In fact, significant portions

(exactly how much is not now evident) of the reserve had been committed to various City departments by the Director of Finance, with the knowledge and apparent approval of the Mayor and leaders of the Council, *before* the unanticipated emergency arose. Although only Council can make appropriations, still, since the transfers were authorized in good faith with Council's acquiescence; and since transfer ordinances could have authorized the intra-budgetary appropriations at the time, we ought to regard the commitments (to whatever extent they were made) as having lawfully diminished the reserve. I would remand the case to the lower court so that it might be ascertained what fiscal commitments were made prior to the advent of the unanticipated emergency.

I agree with the majority that Bills Nos. 822 and 823, which increase the fines for parking and parking meter violations, should be sustained. Those measures result from the legitimate exercise by Council of its interim taxing powers.

I cannot, however, refrain from noting the inconsistency of the majority opinion in upholding the above measures. Council either has the power of interim taxation, or it does not have that power. The majority opinion systematically concludes that Council lacks the power of interim taxation, because neither the Home Rule Charter nor any act of the General Assembly *bestows* the power of interim taxation upon Council. Yet, in a miraculous, and indeed motherless birth, the majority surprisingly finds some interim taxing powers in Council—enough, at least, to produce Bills Nos. 822, 823, which are, as sure as death and taxes, *interim taxes*. (Incidentally, the majority concedes that Bills Nos. 822, 823 were enacted primarily as revenue measures.)

That turn of events, however, substantially changes the basic proposition of the majority opinion. Now the

proposition of the majority becomes: "Council *sometimes* has the power of interim taxation." Now, in contradiction to everything which it said before, the *majority starts implying* interim-taxing powers. But its implications are themselves erratic. For does it enhance the welfare (the basis of the police power) of the people of Philadelphia any more to increase parking fines than it would to enact revenue measures now to avoid *additional* taxpayer expense later? I, for one, do not think so.

Finally, I would uphold Ordinance Bills Nos. 828 and 829 which would raise approximately $28,750,000 for the School District. Section 12-303(e) of the Supplement allows the Board to increase the aggregate total of budget appropriations when "unappropriated revenues become available in sufficient amount to maintain the budget in balance." The quoted language implies the unrestricted power of interim taxation, and justifies the instant taxing measures.

Admittedly, my construction of the relevant provisions of the Charter and its Educational Supplement, as well as the Acts of 1919 and 1949, is as broad as the exigencies of this situation require. However, my basic approach finds warrant in the documents giving the City home rule powers.